NEW YORK URBAN LEAGUE, INC., Straphangers Campaign, Andrea Mapp, Deborah Carrington, and Juan B. Gonzalez, Plaintiffs–Appellees,

v.

The STATE OF NEW YORK, George E. Pataki, as Governor of the State of New York, Joseph L. Bruno, as Temporary President of the New York State Senate, and Sheldon Silver, as Speaker of the New York State Assembly, Defendants,

Metropolitan Transportation Authority, E. Virgil Conway, as Chairman and President of the MTA, Defendants–Appellants.

No. 1112.
Docket 95–9108.

United States Court of Appeals,
Second Circuit.

Argued Nov. 14, 1995.

Decided Dec. 7, 1995.

Eric T. Schneiderman, Kirkpatrick & Lockhart, New York City (Gerald A. Novack, John Sullivan, Peter Vaughan, Alan S. Brodherson, on the brief), for plaintiff-appellee N.Y. Urban League, Inc.

G. Oliver Koppell, Zwerling, Schachter, Zwerling & Koppell, New York City (Dan Drachler, Hillary Sobel, on the brief), for plaintiffs-appellees Straphangers Campaign, Andrea Mapp, Deborah Carrington, and Juan B. Gonzalez.

Jeffrey Glekel, Skadden, Arps, Slate, Meagher & Flom, New York City (Thomas J. Schwarz, Jeremy A. Berman, on the brief), for defendants-appellants Metropolitan Transp. Authority and E. Virgil Conway, as Chairman and President of the MTA.

Harvey J. Golubock, Assistant Attorney General In Charge, Litigation Bureau, New York City (Dennis C. Vacco, Attorney General of the State of New York, Victoria A. Graffeo, Solicitor General, Jeffrey I. Slonim, Gary E. Lesch, Assistant Attorneys General, of counsel), for defendant State of N.Y.

Barbara J. Olshansky, Michael E. Deutsch, The Center for Constitutional Rights, New York City, for amicus curiae The New York City Environmental Justice Alliance.

Before WALKER, LEVAL, and CABRANES, Circuit Judges.

PER CURIAM:

Plaintiffs filed this action on October 20, 1995, challenging the allocation by the State of New York and the Metropolitan Transportation Authority ("MTA") of funds for mass transit in New York City and surrounding suburban communities. Plaintiffs claim that riders of the New York City Transit Authority ("NYCTA") subway and bus system, the majority of whom are members of protected minority groups, pay a higher share of the cost of operating that system than commuter line passengers, who are predominantly white, pay to support the commuter rail system, and that U.S. Department of Transportation ("U.S.DOT") regulations promulgated under Title VI of the Civil Rights Act of 1964 proscribe such a result. Upon filing their complaint, plaintiffs moved for preliminary injunctive relief barring the implementation of a proposed 20% fare increase for subway and bus riders. The United States District Court for the Southern District of New York (Robert P. Patterson, Jr., *Judge*) granted a preliminary injunction against the MTA on November 8, 1995. This court entered a stay the following day.

This appeal presents the narrow question of whether plaintiffs have made the requisite showing for preliminary injunctive relief barring the MTA from imposing the fare increase on the NYCTA lines. To justify such an injunction, plaintiffs must show irreparable harm in the absence of injunctive relief and a likelihood of success on the merits of their underlying claim. We conclude that they have not. Plaintiffs' underlying claim challenges the total allocation of funds to the subway and bus system on the one hand and to the commuter lines on the other. In considering whether plaintiffs had shown a likelihood of success on the merits of this claim, the district court focused on the proposed NYCTA fare increase without examining the broader financial and administrative context in which this fare increase was adopted. As a result, the district court's conclusion that the plaintiffs are likely to succeed on the merits is based upon insufficient evidence. We therefore vacate the injunction and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Facts*

At the heart of this case are the complex systems of public transportation serving New York City and surrounding suburban communities. The following facts are not in dispute. The New York City Transit Authority ("NYCTA") administers the subway and bus system within four boroughs of New York City,[1] transporting some 1.5 billion passengers per year on twenty-five subway lines and 231 bus routes. The Long Island Railroad ("LIRR") and the Metro–North Commuter Railroad ("Metro–North") (collectively, the "commuter lines") carry 135 million passengers per year to some 250 stations located along nineteen lines. The NYCTA has annual operating expenses of $3.1 billion, while the commuter lines have annual operating expenses of $1.4 billion.

Both the NYCTA and the commuter lines operate under the umbrella of the Metropolitan Transit Authority ("MTA"), a public benefit corporation created under New York law. *See* N.Y. PUB.AUTH.LAW §§ 1263(1)(a), 1264 (McKinney 1982 & Supp.1995). The NYCTA is a legally separate public benefit corporation affiliated with the MTA, *id.* § 1201(1), while the LIRR and Metro–North are wholly owned subsidiaries of the MTA.[2] The MTA's

---

1. The Staten Island Rapid Transit Operating Authority ("SIRTOA") provides passenger transportation on Staten Island.

2. The MTA has several other affiliated units and wholly owned subsidiaries. Its wholly owned subsidiaries include the Staten Island Rapid Transit Operating Authority, which provides passenger service on Staten Island, and the Metropolitan Suburban Bus Authority, which provides bus service in New York City and Nassau County. *See* N.Y. TRANSP.LAW § 219–c (McKinney 1994). Its independent affiliated units include the Triborough Bridge and Tunnel Authority, which operates seven bridges and two tunnels within the metropolitan New York City area. *See* N.Y. PUB. AUTH.LAW § 552 (McKinney 1994).

board of seventeen directors also serves as the board of the NYCTA. *Id.* § 1201(1).

Under New York law and applicable bond covenants, the MTA must be self-sustaining with respect to the combined operating expenses of the MTA and its subsidiary corporations, including the commuter lines. *Id.* § 1266(3). Similarly, the NYCTA must be self-sustaining with respect to its operating costs. *Id.* § 1202(1). Because the revenues derived from fares do not meet the operating costs of the NYCTA or the commuter lines, each depends upon funding from federal, state, and city sources to pay a percentage of its costs. The U.S. Department of Transportation ("U.S.DOT") provides operating assistance to the NYCTA and the commuter lines through the MTA. In addition, the NYCTA and the commuter lines receive several categories of state assistance, including: (1) appropriations from the State's General Fund, according to a statutory formula or through specific local assistance appropriations bills, *see* N.Y. TRANSP.LAW § 18–b(1) (McKinney 1994); (2) state and regional taxes deposited in the Metropolitan Mass Transportation Operating Assistance ("MMTOA") account, a certain portion of which is designated annually by the state legislature for payment of the operating costs of the NYCTA and the MTA, including the operating costs of the commuter lines, *see* N.Y. STATE FIN.LAW § 88–a(7)(a) to –a(7)(b) (McKinney 1989 & Supp.1995); (3) shares of mortgage recording taxes collected in New York City and the counties that the MTA serves, apportioned (to the extent relevant for our purposes) according to a statutory formula between the transit and commuter railroad accounts of the MTA's special assistance fund, *see* N.Y. TAX LAW § 261(1)(a) (McKinney Supp.1995); N.Y. PUB.AUTH.LAW § 1270(1)(a) (McKinney Supp. 1995); and (4) statutory shares of an account funded by petroleum business taxes.

The NYCTA and the commuter lines also receive certain local subsidies. The NYCTA receives funds from the City of New York ("City") matching the State's payment from its General Fund, *see* N.Y. TRANSP.LAW § 18–b(5)(a); the MTA receives matching funds from the City and the counties served by the commuter railroads, *see id.* The City and the counties served by the commuter lines are required to reimburse the MTA for the cost of maintaining commuter railroad terminals within their respective borders. *See* N.Y. PUB.AUTH.LAW § 1277 (McKinney 1982). The NYCTA receives some revenue from certain mortgage recording and real estate taxes imposed by the City. The NYCTA has historically been reimbursed by the City for costs of its reduced-fare program for school children, as well as for its provision of services to elderly and disabled persons.

Finally, the NYCTA and the commuter lines receive some level of subsidization from the redistribution of surplus funds of one of the MTA's affiliated units, the Triborough Bridge and Tunnel Authority ("TBTA"). *See* N.Y. PUB.AUTH.LAW § 1219–a(2)(b) (McKinney 1982). By statute, the NYCTA receives $24 million of any surplus outright, plus 50% of the balance, for payment of its operating expenses; the remaining 50% is applied to the operating expenses of the MTA and the commuter lines. *Id.*

In 1994, the NYCTA received total operating assistance of $1.22 billion, while the commuter railroads received total operating assistance of $635 million.[3] It is undisputed, however, that recent actions of the State of New York have reduced the level of state funds appropriated to the NYCTA, as well as the pool of state funds from which appropriations to the NYCTA and the MTA are made. Specifically, plaintiffs contend, and the district court found, that the state budget passed in June 1995 (1) reduced by $86.55 million the NYCTA's share of MMTOA funds, while increasing the commuter lines' share by $12 million; and (2) shifted $220 million from the MMTOA account, from which appropriations to the NYCTA and the commuter lines are made, to the State's General Fund.[4] The net impact of these changes

---

**3.** These figures reflect net subsidies after certain deductions for debt service.

**4.** The record also indicates that the state legislature appropriated $128 million for the NYCTA

from the MMTOA account rather than from the State's General Fund. It is unclear from the record whether the $86.55 reduction in NYCTA funds was connected to this shift, and what im-

upon the overall state subsidization of the NYCTA and the commuter lines is not clear from the record.[5]  It is also not disputed that recent actions of the City have reduced the total level of City funds to the NYCTA. Specifically, the City did not fully reimburse the NYCTA in 1995 for costs associated with its reduced-fare program for City school children.  The NYCTA has projected that it will have to absorb $45 million annually for the reduced fare program.

In August 1995, the MTA projected that the NYCTA's operating costs would exceed its operating revenues (including income from fares and federal, state, and local subsidies) by $167 million in 1995 and $316 million in 1996.  For the commuter lines, the MTA projected a slight surplus for 1995 and a deficit of $72 million for 1996.  In response to these projections, the MTA board considered and adopted a funding package involving cost-cutting measures and fare increases for the NYCTA and the commuter lines. The MTA calculated that a 20% fare increase for the NYCTA would generate $45 million in additional revenue in 1995 and $274 million in additional revenue for 1996; and that a fare increase of 8.5% for the commuter lines would generate $5.6 million in 1995 and $33.5 million in 1996.

## B. *Procedural History*

The thrust of the underlying complaint in this action is that riders of the New York City subway and bus system, compared to passengers on the commuter lines, bear a disproportionately high share of the cost of operating the transportation system they use.  Plaintiffs contend that, inasmuch as the NYCTA serves a predominantly minority population and the commuter lines serve an overwhelmingly white population, the disparity in the share of costs borne by the two groups of passengers violates U.S. DOT regulations promulgated under Title VI of the Civil Rights Act of 1964.[6]  Plaintiffs seek a permanent injunction against the State of New York and the MTA to prevent the "allocat[ion] [of] funds for mass transit in a discriminatory manner."  Complaint at 18, *New York Urban League, Inc. v. Metropolitan Transp. Auth.*, 95 Civ. 9001 (RPP) (filed Oct. 20, 1995).

On October 20, 1995, plaintiffs moved for a preliminary injunction, claiming that fare increases of 20% on the NYCTA subway and bus system and 8.5% on the commuter lines, scheduled to be implemented on November 12, would exacerbate an existing disparity in the relative cost borne by passengers of the subway and bus system and of the commuter lines.  The district court held an evidentiary hearing on the motion on November 2, 1995, and rendered its decision entering a preliminary injunction against the MTA on November 8, 1995, four days before the fare increase was scheduled to take effect.  On the same day, the district court denied the MTA's motion for a stay of the injunction pending appeal.  The MTA filed a notice of appeal and moved in this Court for a stay pending appeal and an expedited briefing schedule.  We granted the motion for a stay on November 9, 1995, thus permitting the

---

pact the shift will have upon funds available to the NYCTA.

5. Because the State and the NYCTA operate on different fiscal years, the $86.55 million reduction in MMTOA funds designated for the NYCTA is apparently spread over two MTA fiscal years. Furthermore, in shifting $220 million from the MMTOA account to the State's General Fund, the State appears not to have tapped any funds specifically designated for the NYCTA.  Of the $220 million, $120 million had been appropriated by the state legislature for use of the commuter lines, and $100 million had not yet been appropriated by the legislature, either for the use of the MTA generally or for the use of the NYCTA. The district court's finding that the state left $110 million in funds available to the commuter lines

while diverting NYCTA funds from the MMTOA account to the General Fund is not supported by the record, and is therefore clearly erroneous. The record suggests that none of the $220 million that was diverted was ever. appropriated for NYCTA use.  The figure of $110 million represents an amount that the legislature may restore to the MMTOA, not the commuter lines specifically, through an appropriation.  No such appropriation has taken place, and the $110 million is therefore not available to the MTA, the NYCTA, or the commuter lines.

6. Plaintiffs also assert a claim against the individual defendants under 42 U.S.C. § 1983, alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.  This appeal relates only to plaintiffs' Title VI claim.

fare increase to take effect as scheduled on November 12, and ordered the parties to develop a plan to compensate riders of the subways and buses in the event that plaintiffs prevailed on this appeal. The district court approved such a plan on November 13, 1995. We heard oral argument on the expedited appeal on November 14, 1995.

■ Because the district court's findings do not support a likelihood of plaintiffs' success on the merits, we must vacate the preliminary injunction.

## II. DISCUSSION

### A. Likelihood of Success on the Merits[7]

Section 601 of Title VI of the Civil Rights Act of 1964 provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. In *Guardians Association v. Civil Service Commission*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Supreme Court held that this provision only prohibits *intentional* discrimination, not actions that have a disparate impact upon minorities. See *id.* at 610–11, 103 S.Ct. at 3236–37 (opinion of Powell, J., in which Burger, C.J., and Rehnquist, J., joined); *id.* at 612, 103 S.Ct. at 3237 (opinion of O'Connor, J.); *id.* at 641–42, 103 S.Ct. at 3253 (opinion of Stevens, J., in which Brennan and Blackmun, JJ., joined). Nonetheless, the Court concluded that Title VI delegated to federal agencies the authority to promulgate regulations incorporating a disparate impact standard. See *id.* at 584, 103 S.Ct. at 3223 (opinion of White, J.); *id.* at 623 n. 15, 103 S.Ct. at 3244 n. 15 (opinion of Marshall, J.);

*id.* at 643, 103 S.Ct. at 3254 (opinion of Stevens, J., in which Brennan and Blackmun, JJ., joined); *see also Alexander v. Choate*, 469 U.S. 287, 293 & nn. 8–9, 105 S.Ct. 712, 716 & nn. 8–9, 83 L.Ed.2d 661 (1985).

The U.S. Department of Transportation has promulgated regulations under Title VI prohibiting actions with a disparate impact upon minorities. 49 C.F.R. § 21.5(b)(2) provides:

A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program ... may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race, color, or national origin....

■ Courts considering claims under analogous Title VI regulations have looked to Title VII disparate impact cases for guidance. See, e.g., *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1407 n. 14 (11th Cir.1993); *Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir.1985); *Larry P. v. Riles*, 793 F.2d 969, 982 nn. 9 & 10 (9th Cir.1984). A plaintiff alleging a violation of the DOT regulations must make a *prima facie* showing that the alleged conduct has a disparate impact. Once such a showing has been made, the burden shifts to the defendant to demonstrate the existence of "a substantial legitimate justification" for the allegedly discriminatory practice. *Georgia State Conference*, 775 F.2d at 1417. If the defendant sustains this burden, the plaintiff may still prove his case by demonstrating that other less discriminatory means would serve the same objective. *Id.; see Larry P.*, 793 F.2d at 982 n. 10.

---

7. We note that the district court applied the proper standard by assessing whether the plaintiffs had demonstrated a likelihood of success on the merits, rather than whether the plaintiffs had demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation. The former showing is required where a party seeks to block " 'government action taken in the public interest pursuant to a statutory or regulatory scheme.' " *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995) (per curiam) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)); *see Catanzano v. Dowling*, 60 F.3d 113, 117 (2d Cir.1995). The injunction under review in this case blocked an NYCTA fare increase that was to be implemented in accordance with the special powers of the NYCTA board as set forth in N.Y. PUB.AUTH.LAW § 1205(1) (McKinney 1982). Thus, the fare increase can fairly be described as the product of "action taken in the public interest pursuant to a statutory or regulatory scheme."

The underlying complaint in this case alleges that actions of the State of New York and the MTA have "placed a disproportionate amount of the cost of operating the MTA upon the predominantly minority riders of the NYCTA"—*i.e.*, that riders of the city subways and buses pay a higher percentage of the operating cost of the NYCTA than commuter rail passengers pay of the operating costs of the commuter rails. Complaint at 17. Plaintiffs do not dispute that (1) the allocation of subsidies to the NYCTA and the commuter lines is commanded by state law; and (2) both the NYCTA and the commuter lines (or, more precisely, the MTA with respect to the commuter lines) are required to operate on a self-sustaining basis with respect to their operating costs. If the State chooses to allocate funds in a certain manner (or, for that matter, if the City decides to withhold funds from the NYCTA), and, as a result, sufficient funds are not available to meet the NYCTA's operating expenses, the NYCTA board (also the board of the MTA) has no choice within the framework of state law but to respond, either by adjusting the level of revenue taken in by the NYCTA or by taking other actions, such as cutting service. The plaintiffs ultimately object to and seek to alter the allocation of subsidies as between the NYCTA and the commuter lines.

The district court concluded that (1) plaintiffs had made a *prima facie* showing that the proposed fare increases, taken together, would have a disparate impact upon members of protected minority groups; and (2) the MTA had failed to demonstrate a substantial legitimate justification for its conduct. In so doing, the district court assessed the impact of the NYCTA and commuter line fare increases without examining the larger financial and administrative picture of which those fare increases are a part. We conclude that the district court made insufficient findings to support either of its conclusions.

We note that plaintiffs' claim under the DOT regulations raises numerous threshold legal issues briefed at length on this appeal, including: (1) whether the DOT regulations, which target a recipient's decisions as to "the types of services, financial aid, or other benefits" it will provide, cover an allocation of subsidies; (2) whether subsidies to two different transportation systems are a proper subject for comparison under the regulations; and (3) whether the State of New York, though not a direct recipient of funds designated for the MTA, is nonetheless a proper defendant under the regulations. We need not reach these questions, because we conclude that, even if there were a legal basis for the plaintiffs' challenge against either the MTA or the State of New York, the preliminary injunction against the MTA is not supported by the record.

### 1. Prima Facie *Showing of Disparate Impact*

■ The district court's conclusion that the plaintiffs had made a *prima facie* showing of disparate impact was based primarily upon a comparison of the so-called "farebox recovery ratios" of the NYCTA and the commuter lines. The farebox recovery ratio measures the percentage of each system's operating cost—adjusted to include certain interest payments, depreciation, and the cost of police services—that is recovered through fare revenues. The district court found that the NYCTA fare increase would lead to a significant (12.2%) increase in the farebox recovery ratio for the subway and bus system, while the commuter line fare adjustment would lead to smaller increases (2.6% and 2.2%) in the respective farebox recovery ratios of Metro–North and LIRR.

Because the underlying claim challenges the total allocation of subsidies to the NYCTA and the commuter lines, the district court should have first assessed whether any measure or combination of measures could adequately capture the impact of these subsidies upon NYCTA and commuter line passengers. The MTA contends that the relative costs borne and benefits received by passengers of the two systems cannot be measured at all, because users of the NYCTA derive significant but difficult-to-quantify benefits from the subsidization of the commuter lines, including a reduction in traffic congestion, pollution, and other adverse effects that would accompany an increased use of cars by those commuting from the suburbs. The MTA

also argues that, to the extent that the relative costs and benefits of the two systems can be measured at all, statistics other than the farebox recovery ratio are more appropriate, including: (1) the percentage of mean household income that NYCTA and commuter line passengers spend on commuting; (2) a comparison of the relative population of the areas served by the two systems and the relative subsidies flowing to each system; and (3) a measure reflecting relative capital subsidies to each system.

The district court made no finding that the farebox recovery ratio was the most appropriate measure of the allocation of subsidies to the NYCTA and the commuter lines. The court appears to have focused upon the ratio simply because the MTA records this statistic. At oral argument before this Court, however, the parties offered different explanations as to why the MTA does so. The MTA contends that it records farebox recovery ratios not to measure disparities in relative subsidization, but to measure the operating efficiency of its various affiliated units and subsidiaries. The plaintiffs, on the other hand, suggest that the MTA is interested in tracking the percentage of costs borne by the passengers of the different systems. Regardless of the reason the MTA keeps the statistic, the district court could not properly find a disparate impact on the sole basis of the farebox recovery ratio unless it reasonably found that this ratio would be a reliable indicator of a disparate impact. The district court made no such finding.

In our view, the farebox recovery ratio is not a sufficient basis for a finding of disparate impact. While for some purposes the farebox recovery ratio may be a convenient measure of the share of costs borne by different groups of passengers, the ratio ignores financial reality in an important respect. It does not reveal the extent to which one system might have higher costs associated with its operations—costs stemming from different maintenance requirements, schedules of operation, labor contracts, and so on. There is no reason to assume that the expenses of each system would bear any sort of proportionate relationship, particularly when those systems are fundamentally different in terms of how they carry passengers, frequency of stops, and operating schedules. The different costs associated with the two systems can, in effect, obscure the level of subsidies provided to each. The farebox recovery ratio thus says very little about the overall allocation of funds to the two systems, which is the focus of the complaint in this action. Without further factual findings supporting its selection as an appropriate statistical measure of the subsidization of transportation systems, the farebox recovery ratio itself is insufficient to support a conclusion that the total allocation of subsidies has a disparate impact upon minority NYCTA riders—a conclusion essential to a determination of plaintiffs' likelihood of success on the merits.

### 2. *Substantial Legitimate Justification*

▇▇ Even if there were a sufficient basis on this record for a finding that plaintiffs had made a *prima facie* showing of disparate impact, the district court's conclusion as to the second prong of the analysis—whether the defendants have shown a substantial legitimate justification for the challenged conduct—is likewise unsupported. The district court found that, "absent State appropriations or a substantial cutback in personnel with consequential cutbacks in operations, a fare increase for the NYCTA *is a business necessity in the near future*." *New York Urban League, Inc. v. Metropolitan Transp. Auth.*, 905 F.Supp. 1266, 1278 (S.D.N.Y.1995) (emphasis supplied). Nevertheless, the district court ultimately concluded that the MTA had not provided a legitimate justification for the NYCTA fare increase. In so concluding, the district court reasoned that: (1) even though an NYCTA fare increase will be necessary in the near future, there is no reason for the relative NYCTA and commuter line fare increases to lead to a disparate impact; and (2) even if a smaller NYCTA fare increase would be necessary to meet future operating costs, the full 20% fare increase is unnecessary because a portion of the revenue it is to generate is earmarked for a capital program that has not yet been approved.

The district court's first observation—that there is no reason for the NYCTA and com-

muter line fare increases to result in a disparate impact—is unsupported. The district court's reasoning seems to suggest that the MTA could meet its revenue goals through an equal fare increase for the NYCTA and the commuter lines. Even if the MTA could shift fare revenues from the commuter lines to the NYCTA, the district court made no finding that the availability of commuter line revenues would significantly affect the necessity for the 20% increase on the NYCTA. Indeed, the MTA offered testimony that raising the equivalent revenues through an equal percentage increase on each system would result in a 22¢ increase of the NYCTA fare, likely to be rounded to 25¢ (or 20%). In the alternative, the district court's reasoning suggests that plaintiffs' legal claim would be resolved if the MTA were to increase the commuter line fare by 20%, or by whatever amount would yield the same farebox recovery ratio as that projected for the NYCTA. But the district court made no finding that a greater increase in the commuter fare would provide a means for increasing the NYCTA's revenues, or eliminate the justification for the NYCTA raise.

The district court's second rationale for rejecting the MTA's claim of a substantial legitimate justification is equally unpersuasive. The district court's findings do not support the conclusion that the proposed NYCTA capital program is inappropriate or unnecessary, and no basis for such a finding appears in the current record.[8]

Thus, the district court made insufficient findings to reject the MTA's stated justification for a fare increase. Indeed, the district court did not properly frame the question: the focus of the plaintiffs' complaint is the total allocation of subsidies to the NYCTA and the commuter lines, but the district court did not consider, much less analyze, whether the defendants had shown a substantial legitimate justification for this allocation. The MTA and the State identified several factors favoring a higher subsidization of the com-

muter lines. By encouraging suburban residents not to drive into the City, subsidization of the commuter rails minimizes congestion and pollution levels associated with greater use of automobiles in the city; encourages business to locate in the City; and provides additional fare-paying passengers to the City subway and bus system. In these respects and in others, subsidizing the commuter rails may bring material benefits to the minority riders of the subway and bus system. The district court dismissed such factors, concluding that the MTA board did not explicitly consider them before voting on the NYCTA and commuter line fare increases. That finding is largely irrelevant to whether such considerations would justify the relative allocation of total funds to the NYCTA and the commuter lines.

### B. *Inappropriateness of the Remedy*

■ Even if there were sufficient support in the district court's findings for the conclusion that plaintiffs are likely to succeed in showing disparate impact, the preliminary injunction barring the fare increase could not stand. The theory of the complaint is not that NYCTA passengers are being required to pay too high a fare. Rather, it is that they receive, through the NYCTA, disproportionately low subsidies in comparison to commuter line passengers. Where the MTA sets the NYCTA fare is a managerial decision based on the NYCTA's total economic situation and service goals. Increases in the NYCTA's subsidies would not give its passengers a legal right to lower fares. It would call for a management decision whether to use the increased subsidies to reduce fares, increase service, or provide for future needs. Furthermore, any disparity of subsidies could equally be cured by reducing the subsidies of the commuter lines, which would obviously not entitle the NYCTA riders to reduced fares. Thus, the remedy of enjoining the NYCTA fare increase is not responsive to the asserted violation—the alleged disparate

8. The record does indicate that a member of the MTA Capital Program Review Board, which approves such programs, has opposed the current proposal. Under the governing statute, her disapproval would be sufficient to defeat the proposal, at least temporarily. *See* N.Y. PUB.AUTH.

Law § 1269–b(3) (McKinney 1982). Nonetheless, a conclusion that no other capital program is likely to be approved and that the revenues generated by the fare increase would be unnecessary remains entirely speculative.

impact in subsidies. In the circumstances here presented, the injunction against the NYCTA fare increase is inappropriate to remedy the particular wrong alleged by the plaintiffs.

### CONCLUSION

We conclude that plaintiffs are not entitled to an injunction on the grounds articulated by the district court. The district court's conclusion that plaintiffs were likely to succeed on the merits of their claim was based upon insufficient findings that a disparate impact exists or that the defendants' proffered justifications were inadequate. Even if the district court had a sufficient basis to conclude that the plaintiffs were likely to succeed in demonstrating a legal violation, the district court granted a remedy entirely inappropriate to address the violation that the plaintiffs claim exists.

Accordingly, we vacate the injunction and remand the cause for further proceedings consistent with this opinion.