

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-1999

# Powell et.al v. Ridge, et. al.

Precedential or Non-Precedential:

Docket 98-2096

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Powell et.al v. Ridge, et. al." (1999). *1999 Decisions.* Paper 236.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/236

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 25, 1999

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 98-2096

DAVID POWELL; SHELEAN PARKS; PATRICE EVERAGE; JULIA A. DAVIS; YVETTE
BLAND;
GERALDINE NEWTON; MARIA M. RIVERA; MARY E. MILLER; GREGORY LUZAK;
CATHERINE
LUZAK; FU-ZHEN XIE; THE BLACK CLERGY OF PHILADELPHIA AND VICINITY;
PHILADELPHIA
BRANCH NAACP; ASPIRA, INC. OF PENNSYLVANIA; PARENTS UNION FOR PUBLIC
SCHOOLS;
CITIZENS COMMITTEE ON PUBLIC EDUCATION IN PHILADELPHIA; PARENTS UNITED FOR
BETTER SCHOOLS; DAVID W. HORNBECK, SUPERINTENDENT, The School District of
Philadelphia;
FLOYD W. ALSTON, PRESIDENT, Board of Education of the School District of
Philadelphia; BOARD OF
EDUCATION OF THE SCHOOL DISTRICT OF PHILADELPHIA; THE SCHOOL DISTRICT OF
PHILADELPHIA; EDWARD G. RENDELL, MAYOR, City of Philadelphia; CITY OF
PHILADELPHIA

PHILADELPHIA FEDERATION OF TEACHERS LOCAL 3; TED KIRSCH, PRESIDENT,
GUARDIAN AD
LITEM, Intervenors in D.C.

v.

THOMAS J. RIDGE, Governor of the Commonwealth of Pennsylvania; JAMES P.
GALLAGHER,
CHAIRPERSON, Commonwealth of Pennsylvania State Board of Education; EUGENE
W. HICKOK,
SECRETARY OF EDUCATION; BARBARA HAFER, TREASURER

MATTHEW J. RYAN; ROBERT C. JUBELIRER; JESS M. STAIRS; JAMES J. RHOADES,
Intervenors in
D.C.

DAVID POWELL; SHELEAN PARKS; PATRICE EVERAGE; JULIA A. DAVIS; YVETTE
BLAND;
GERALDINE NEWTON; MARIA M. RIVERA; MARY E. MILLER; GREGORY LUZAK;
CATHERINE
LUZAK; FU-ZHEN XIE; THE BLACK CLERGY OF PHILADELPHIA AND VICINITY;
PHILADELPHIA
BRANCH NAACP; ASPIRA, INC. OF PENNSYLVANIA; PARENTS UNION FOR PUBLIC
SCHOOLS;
CITIZENS COMMITTEE ON PUBLIC EDUCATION IN PHILADELPHIA; PARENTS UNITED FOR
BETTER SCHOOLS; DAVID W. HORNBECK; FLOYD W. ALSTON; BOARD OF EDUCATION OF
THE
SCHOOL DISTRICT OF PHILADELPHIA; THE SCHOOL DISTRICT OF PHILADELPHIA;
EDWARD G.
RENDELL; CITY OF PHILADELPHIA, Appellants No. 98-2157

DAVID POWELL; SHELEAN PARKS; PATRICE EVERAGE; JULIA A. DAVIS; YVETTE BLAND; GERALDINE NEWTON; MARIA M. RIVERA; MARY E. MILLER; GREGORY LUZAK; CATHERINE LUZAK; FU-ZHEN XIE; THE BLACK CLERGY OF PHILADELPHIA AND VICINITY; PHILADELPHIA BRANCH NAACP; ASPIRA, INC. OF PENNSYLVANIA; PARENTS UNION FOR PUBLIC SCHOOLS; CITIZENS COMMITTEE ON PUBLIC EDUCATION IN PHILADELPHIA; PARENTS UNITED FOR BETTER SCHOOLS, INC.; DAVID W. HORNBECK, SUPERINTENDENT, The School District of Philadelphia; FLOYD W. ALSTON, PRESIDENT, Board of Education of the School District of Philadelphia; BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF PHILADELPHIA; THE SCHOOL DISTRICT OF PHILADELPHIA; EDWARD G. RENDELL, MAYOR, City of Philadelphia; CITY OF PHILADELPHIA

PHILADELPHIA FEDERATION OF TEACHERS LOCAL 3; TED KIRSCH, PRESIDENT, GUARDIAN AD LITEM, Intervenors in D.C., Appellants

v.

THOMAS RIDGE, Governor of the Commonwealth of Pennsylvania; JAMES P. GALLAGHER, Chairperson Commonwealth of Pennsylvania State Board of Education; EUGENE W. HICKOK, Secretary of Education; BARBARA HAFER, Treasurer

MATTHEW J. RYAN; ROBERT C. JUBELIRER; JESS M. STAIRS; JAMES J. RHOADES, Intervenors in D.C. On Appeal from the United States District Court for the Eastern District of Pennsylvania (D. C. No. 98-cv-01223) District Judge: Hon. Herbert J. Hutton

Argued June 9, 1999

Before: SLOVITER and MANSMANN, Circuit Judges and WARD, District Judge*

(Filed: August 25, 1999)

Michael Churchill Public Interest Law Center of Philadelphia Philadelphia, PA 19107

Patricia A. Brannan (Argued) Hogan & Hartson Washington, D.C. 20004

William T. Coleman, Jr. (Argued) Stephen J. Harburg O'Melveny & Myers Washington, D.C. 20004

_____

* Hon. Robert J. Ward, United States District Judge for the Southern District of New York, sitting by designation.

Stephanie L. Franklin-Suber City Solicitor Richard G. Feder Jane Lovitch
Istvan City of Philadelphia Law
Department Philadelphia, PA 19102

James J. Rodgers Lynn R. Rauch Dilworth Paxson Philadelphia, PA 19103

Ralph J. Teti Willig, Williams & Davidson Philadelphia, PA 19103

Attorneys for Appellants

Judith A. Winston General Counsel Bill Lann Lee Acting Assistant Attorney
General Stephen Y. Winnick Karl M.
Lahring Adina N. Kole Department of Education Dennis J. Dimsey Seth M.
Galanter United States Department of
Justice Civil Rights Division Washington, D.C. 20035

Attorneys for United States as Amicus-Curiae in 98-2096 Edward F. Mannino
(Argued) J. Kevin Fee Akin, Gump,
Strauss, Hauer & Feld Philadelphia, PA 19103

Paul A. Tufano General Counsel Commonwealth of Pennsylvania Office of
General Counsel Harrisburg, PA 17120
Gregory E. Dunlap Deputy General Counsel Commonwealth of Pennsylvania
Office of General Counsel
Harrisburg, PA 17108

James M. Sheehan Chief Counsel Joseph M. Miller Assistant Counsel
Commonwealth of Pennsylvania Department
of Education Harrisburg, PA 17126

Robert J. Schwartz Chief Counsel Commonwealth of Pennsylvania Treasury
Department Harrisburg, PA 17120

John P. Krill, Jr. (Argued) Linda J. Shorey David R. Fine Jacqueline E.
Jackson-DeGarcia Kirkpatrick & Lockhart
Harrisburg, PA 17101

Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Before us is an appeal by plaintiffs, including eleven parents of children who attend public schools in Philadelphia suing on their own behalf and that of their children (hereafter "school children"), from the order of the United States District Court for the Eastern District of Pennsylvania dismissing their complaint under Federal Rule of Civil Procedure 12. The complaint challenges the practices of the Commonwealth of Pennsylvania in funding public education as having a racially discriminatory effect. This appeal requires us to consider whether a private plaintiff may state a claim under a

regulation implementing Title VI, whether the complaint adequately states a claim under that regulation, and whether a claim may be maintained under 42 U.S.C. § 1983 for violation of that regulation.

I.

On March 9, 1998, a diverse group of plaintiffsfiled suit against several Pennsylvania officials, alleging in Count I the violation of the regulation the Department of Education (DOE) adopted to implement Title VI of the Civil Rights Act of 1964, and in Count II a violation of 42 U.S.C.§ 1983. The parents of several Philadelphia public school children were joined as plaintiffs by the following six organizations that devote substantial resources to overcoming what they allege are the disparate and inadequate educational programs caused by the challenged practices: (1) The Black Clergy of Philadelphia and Vicinity; (2) Philadelphia Branch NAACP; (3) ASPIRA, Inc. of Pennsylvania; (4) Parents Union of Public Schools; (5) Citizens Committee on Public Education in Philadelphia; and (6) Parents United for Better Schools. Also joining as plaintiffs were several local officials and entities: (1) the School District of Philadelphia; (2) its superintendent, David W. Hornbeck; (3) its Board of Education; (4) the Board's president, Floyd W. Alston; (5) the City of Philadelphia; and (6) the City's mayor, Edward G. Rendell. These original plaintiffs were later joined without objection by intervenors the Philadelphia Federation of Teachers Local 3 AFT AFL-CIO, and Ted Kirsch as Guardian ad Litem.

The complaint names as defendants four state employees in their "official and individual capacities": Thomas J. Ridge, Governor of the Commonwealth of Pennsylvania; Dr. James P. Gallagher, Chairperson of the Board of Education of the Commonwealth of Pennsylvania; Dr. Eugene W. Hickok, Secretary of Education; and Barbara Hafer, Treasurer, (the "executive defendants"). Four Commonwealth legislative leaders, Representative Matthew J. Ryan, Senator Robert C. Jubelirer, Representative Jess M. Stairs, and Senator James J. Rhoades, joined as intervenor defendants ("legislative defendants").

All of the plaintiffs seek two forms of relief: (1) "a declaration that the defendants `through their funding policies and practices, discriminate against African- American, Hispanic, Asian and other minority students in the School District and the City' " in violation of the administrative regulation promulgated under Title VI and (2) "an injunction prohibiting defendants prospectively `from continuing to implement a system of funding public schools that discriminates against . . . minority children enrolled in' the School District `and that thereby harms' all plaintiffs." Appellants' Br. at 16. The school children and organizations also seek "a declaration that [the] funding policies and practices deprive them of the rights, privileges and immunities secured by

the laws of the United States, in violation of § 1983." Appellants' Br. at 16.

On May 4, 1998, the original defendants filed a motion to dismiss the complaint under Rule 12(b)(6). In June, the United States filed a brief amicus curiae in support of the plaintiffs. On July 6, 1998, the intervening defendants also filed a Rule 12(b)(6) motion to dismiss. The United States then filed a second brief amicus curiae.

The original defendants and the intervening defendants each filed a second motion to dismiss after the Supreme Court dismissed its grant of certiorari in Chester Residents Concerned for Quality Living v. Seif, 132 F.3d 925 (3d Cir. 1997), vacated as moot, 119 S. Ct. 22 (1998). Certiorari had been sought on this court's holding in Chester Residents that an implied private right of action exists under the regulations promulgated under Title VI. In response to the four motions to dismiss, plaintiffs requested oral argument and/or a status conference, and the United States notified the District Court that it intended to file an additional amicus brief addressing the Chester Residents decision. The District Court, however, dismissed the complaint for failure to state a claim without holding the requested status conference, hearing oral argument, or waiting to receive the government's third amicus brief.

Our review of a district court's dismissal of a complaint is plenary. See Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). We apply the same test the district court should have used initially. See Holder v. City of Allentown, 987 F.2d 188, 193 (3d Cir. 1993). We will not uphold a dismissal for failure to state a claim if, "under any reasonable reading of the pleadings, plaintiff may be entitled to relief." Id. at 194. In reviewing the plaintiff's complaint, "[w]e are required to `accept as true the facts alleged . . . and all inferences that can be drawn therefrom.' " D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1367 (3d Cir. 1992) (en banc) (quoting Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990)).

II.

Section 601 of Title VI of the Civil Rights Act of 1964 provides:

No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d.

The Supreme Court has held that section 601 of Title VI prohibiting exclusion or discrimination from federal programs on account of race, color or national origin prohibits only intentional discrimination. See Guardians Ass'n v. Civil Service Comm'n, 463 U.S. 582 (1983).

However, another provision of Title VI, section 602, "authorize[s] and direct[s]" federal departments and agencies that extend federal financial assistance to particular programs or activities "to effectuate the provisions of section 2000d [section 601] . . . by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d–1. At least 40 federal agencies have adopted regulations that prohibit disparate-impact discrimination pursuant to this authority. See Guardians, 463 U.S. at 619 (Marshall, J. dissenting).

The Department of Education, in exercising its statutory authority under section 602, promulgated such a regulation, codified as 34 C.F.R. § 100.3(b)(2), which prohibits a funding recipient from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the program as respects individuals of a particular race, color, or national origin." Id. Count I of the complaint before us is based on this regulation prohibiting discriminatory effects in educational programs.

A.

The District Court held that the complaint fails to state a claim under Title VI1 or the Department of Education's

_____

1. The District Court read the complaint as alleging a violation of Title VI. At oral argument, the plaintiffs' counsel acknowledged that the complaint does not have a separate count under the statute, although it does allege that defendants adopted their different funding methodologies with knowledge of the racially discriminatory consequences. Counsel noted that in a recent decision, Davis v. Monroe County Board of Education, 119 S. Ct. 1661 (1999), the Supreme Court held that in some circumstances a school district's deliberate indifference to sexual harassment of which it had knowledge amounts to an intentional violation of Title IX. Counsel here argued that there is a spectrum between the extremes of intentional discrimination and Title VI

regulations because it does not adequately allege that a specific element of the Commonwealth's funding practices adversely and disproportionately affects students of a particular race. Powell v. Ridge, No. 98–1223, slip op. at 32 (E.D. Pa. Nov. 18, 1998). Plaintiffs challenge this holding on appeal, insisting that their complaint meets the applicable pleading standard.

Although the Supreme Court has not yet spoken on the issue, the courts of appeals have generally agreed that the parties' respective burdens in a Title VI disparate impact case should follow those developed in Title VII cases. See, e.g., New York Urban League, Inc. v. New York, 71 F.3d 1031, 1036 (2d Cir. 1995); City of Chicago v. Lindley, 66 F.3d 819, 828-29 & n.12 (7th Cir. 1995); Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1407 (11th Cir. 1993); cf. NAACP v. Medical Ctr., Inc., 657 F.2d 1322, 1333 (3d Cir. 1981) (en banc) (accepting without comment parties' suggestion that "the decisional law allocating the burden of production and persuasion under Title VII is instructive in [a Title VI] case"). Thus, a plaintiff in a Title VI disparate impact suit bears the initial burden of establishing a prima facie case that a facially neutral practice has resulted in a racial disparity. See Ferguson v. City of Charleston, ___ F.3d ___, 1999 WL 492681 (4th Cir. July 13, 1999); New York Urban League, 71 F.3d at 1036; Elston, 997 F.2d at 1407. If the plaintiff meets that burden, then the defendant must establish a "substantial legitimate justification," see New York Urban League, 71 F.3d at 1036, or a "legitimate, nondiscriminatory reason[]," Medical Ctr. Inc., 657 F.2d at 1331, for the practice. See Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1417 (11th Cir. 1985). Once the defendant meets its rebuttal burden, the plaintiff must then establish either that the defendant overlooked an equally effective alternative with less discriminatory effects or that the proffered justification is no more than a pretext for racial discrimination. See Georgia State Conference, 775 F.2d at 1417.

_____

discriminatory effect.  It appears that plaintiffs suggest that with discovery they may be able to make a case of intent under Title VI comparable to that which the Court accepted in Davis as meeting the intent requirement under Title IX. Without deciding whether a variation of the Davis standard applies here, we believe that plaintiffs have made adequate allegations to survive a motion to dismiss and justify discovery. We note that plaintiffs here recognized that "allegations of racial discrimination are very serious." Plaintiffs should not be penalized for their scrupulousness in declining to include allegations against elected officials concerning conduct that they suspect but of which they currently have no direct proof.


At trial, a Title VI disparate impact plaintiff cannot meet the burden of establishing a prima facie case without proving "that the defendants' racially neutral practice detrimentally affects persons of a particular race to a greater extent than other races." Id. at 1421. It is not enough for the plaintiff "merely [to] prove circumstances raising an

inference of discriminatory impact at issue; [the plaintiff] must prove the discriminatory impact at issue." Johnson v. Uncle Ben's Inc., 657 F.2d 750, 753 (5th Cir. 1981).

The burden a Title VI plaintiff must meet to survive a motion to dismiss, however, is much less onerous. To survive a motion to dismiss, all that the plaintiff must do is plead that a facially neutral practice's adverse effects fall disproportionately on a group protected by Title VI. The Court of Appeals for the Eighth Circuit explained in Ring v. First Interstate Mortgage, Inc., 984 F.2d 924 (8th Cir. 1993): "the prima facie case under [disparate impact] analysis is an evidentiary standard -- it defines the quantum of proof plaintiff must present to create a rebuttable presumption of discrimination . . . . Under the Federal Rules of Civil Procedure, an evidentiary standard is not a proper measure of whether a complaint fails to state a claim." Id. at 926. Furthermore, as the Supreme Court has stated, "[w]hen a federal court reviews the sufficiency of a complaint . . . [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord Lake v. Arnold, 112 F.3d 682, 688 (3d Cir. 1997).

The complaint in this case states, inter alia: The Commonwealth Defendants' funding system for education gives school districts with high proportions of white students on average more Commonwealth treasury revenues than school districts with high proportions of non-white students, where the levels of student poverty are the same. App. at 37-38.

When Commonwealth treasury revenues per pupil are analyzed by the amount of poverty in school districts across the Commonwealth . . . school districts with higher proportions of non-white students receive less Commonwealth treasury revenues than districts with higher proportions of white students. App. at 38-39.

On average, for 1995-96, for two school districts with the same level of poverty . . . the school districts with higher non-white enrollment received $52.88 less per pupil for each increase of 1% in non-white enrollment. App. at 39.

The Commonwealth's funding policies and practices disadvantage . . . students in [underfunded] districts . . . . The foreseeable result [of the funding policies] has been serious impairment of the educational opportunities of the students in the School District, including the Student Plaintiffs. Lack of sufficient resources in the School District

results, inter alia, in larger class sizes and higher pupil–to–teacher ratios than in surrounding school districts; reduced curricula; cuts in and elimination of programs and electives and advanced placement courses, shortages of textbooks and use of outdated textbooks; shortages of equipment, supplies and technology; spartan physical education and extracurricular programs; lack of librarians and library services; insufficient numbers of counselors and psychologists; and many inadequate and crumbling physical facilities.

App. at 40–41.

These allegations are sufficient to put the defendants on notice that the plaintiffs will attempt to prove (1) that less educational funding is provided by the Commonwealth to school districts attended by most non–white students in Pennsylvania than to school districts attended by most white students, (2) that the school districts attended by most non–white students in Pennsylvania receive less total educational funding than do the school districts attended by most white students,[2] (3) that these disparities in funding are produced by the Commonwealth's funding formula, and (4) that the funding disparities injure non– white students by limiting their educational opportunities. Although the language of the complaint may not always be precise or its thrust clear, we nonetheless believe that plaintiffs' allegations provide more than sufficient notice to meet the pleading standard. We therefore hold that the plaintiffs should be given the opportunity to offer evidence in support of their claims. Whether they will ultimately be entitled to prevail is a very different question on which we express no opinion.

The District Court's contrary conclusion that the plaintiffs' complaint does not meet the pleading standard rests on a mischaracterization of the complaint. The District Court described the complaint as alleging that "the uniformly applied state formula for allocating basic education funds among the 501 school districts does not bring about the same results in Philadelphia as it might in another, more affluent district. . . ." Powell, slip op. at 29. This characterization suggests that the disparity the plaintiffs have pled is one based on economic circumstances rather than race. However, the complaint specifically alleges that the disparity in funding cannot be explained by reference to relative wealth or poverty because the disparities are present when districts of the same poverty level are compared. See, e.g., App. at 37–39.

---

2. In their reply brief, the plaintiffs state, "The Complaint alleges adverse racial impact in both the distribution of Commonwealth treasury revenues and the allocation of total public school funding dollars in Pennsylvania, for which the Commonwealth is statutorily and constitutionally responsible. See, e.g., J.A. 35–39, ¶¶ 47, 52, 56, 57."

Appellants' Reply Br. at 24. Although a liberal reading of the paragraphs cited appears to support plaintiffs' statement, if there is any disagreement as to whether the complaint does so allege, it can be resolved by amendment.

The District Court also stated that "the Plaintiffs want the School District to get more than the statutory formula provides under the theory that factors external to the state subsidy program make education more expensive or funding shortfalls greater in Philadelphia." Powell, slip op. at 32. This misstates the plaintiffs' request. Notwithstanding the District Court's characterization, the plaintiffs do not rely on any factors external to the state subsidy program in seeking more funding than is provided under the statutory formula. According to their allegations, they seek more funding on the ground that the formula provides minority school districts3 with less funding than it does similarly situated non-minority districts, regardless of the cost of education.

Because these mischaracterizations affected the District Court's decision and because a review of the complaint establishes that the complaint, when not mischaracterized, meets the pleading standard, we must reverse.

Defendants argue that the complaint fails to state a claim because it compares the effect of the funding formula on school districts rather than its effect on individuals. Unquestionably, under Title VI and 34 C.F.R. § 100.3(b)(2), the disparate impact complained of must fall on an individual rather than on a school district. Plaintiffs, cognizant of that requirement, have alleged that the Commonwealth's funding system results in proportionately less funding per child to school districts with high proportions of non-white students than to school districts with high proportions of white students. They argue that the effect of less funding per student is larger class sizes, higher pupil per teacher ratios, reduced curricula, fewer programs, and less textbooks, equipment, supplies, and technology per student than received by school districts with proportionately more white students. While it may

_____

3. The complaint focuses on the Philadelphia School District which is alleged to have a 77% to 80% minority student body. Plaintiffs allege that there are eleven other school districts in Pennsylvania with student bodies composed of more than 50% minorities.

ultimately be more difficult to prove the impact, and consequently the disparate impact, on the school children because

the funding is directed to the school districts, that potential difficulty does not justify denying plaintiffs the opportunity to prove the effect alleged.

Defendants also argue that plaintiffs' comparisons of school districts are invalid because there are some white students in the allegedly disadvantaged minority school districts and some non-white students in the allegedly advantaged white school districts. Defendants' position was made explicit at oral argument when their counsel stated that in order to show an adverse effect, "It's my position that [plaintiffs] have to show that 100 percent [of the minority students] are, in fact, adversely affected." Transcript of Oral Argument at 53. We know of no authority that imposes such a requirement. The regulation merely prohibits "the effect of subjecting individuals to discrimination because of their race." If plaintiffs succeed in their attempt to show disparate effect resulting from the challenged funding practices, the number of non-white school children affected might be relevant to the factfinder's determination whether the adverse effect is "because of their race." We have never held, however, that as a matter of law the practice complained of must affect a certain minimum percentage of the minority group to justify a finding that the discrimination is because of race.

In addition, defendants complain that plaintiffs only compare subsets of school districts, selected by reference to such factors as poverty, proximity to the School District, or "high proportion" of minority school children (sometimes described as 75% or more minority enrollment). Specifically, defendants contend that plaintiffs never "compare the total revenues of all minority districts, however defined, with the total revenues of all majority districts [presumably per student]." Executive Defendants' Br. at 22. We need not determine here whether the particular comparisons plaintiffs make in their complaint are either necessary or sufficient to prove disparate impact. The relevance and validity of these comparisons goes to the merits of plaintiffs' case, not to the maintenance of their complaint, and should be determined only upon a developed record. Finally, defendants contend that the complaint is insufficient because it fails to identify a particular part of the funding formula as producing the disparate impact. This argument assumes without justification that it is a portion of the formula and not the formula as a whole that produces the alleged effects. Moreover, it would be a daunting hurdle were plaintiffs required at the pleading stage, before answers have been filed and before discovery, to identify what specific portion or portions of the Commonwealth's complex funding formula is responsible for the alleged inequality. We note that there are many components to the Commonwealth's formula, which the plaintiffs allege was changed each year between 1991–92 and 1996–97. Indeed, even after requesting

and receiving supplemental briefs from the parties concerning that formula, we remain unable to discern with precision the basis on which the Commonwealth funds the school districts. It may be that some of the necessary information will be forthcoming from the defendants' files and employees during discovery.

Under these circumstances, we conclude that the plaintiffs did not need to identify in the complaint a particular portion of the formula as objectionable in order to plead a disparate impact claim. To survive a motion to dismiss, plaintiffs need merely plead sufficient allegations to put the defendants on notice of what they intend to prove at trial. The defendants in this case are on notice that plaintiffs intend to prove that their funding formula produces disparate effects, and the defendants are in as good a position as anybody to know precisely what that funding formula entails.

B.

Defendants argue that we should uphold the District Court's decision on the alternate ground that Title VI regulations do not provide a private right of action. It is by now well established that implication of a private right of action for a statute requires analysis of the factors set forth in Cort v. Ash, 422 U.S. 66 (1975). The Cort factors ask:

First, is the plaintiff "one of the class for whose especial benefit the statute was enacted"-- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Id. at 78 (citations omitted). A similar analysis which incorporates the Cort factors is appropriate in determining whether to infer a private right of action from an agency rule or regulation. See Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939 (3d Cir. 1985).

In Chester Residents, 132 F.3d at 927, a decision that has since been vacated as moot, this court considered the issue before us here, "whether a private right of action exists under discriminatory effect regulations promulgated by federal administrative agencies pursuant to section 602 of Title VI." Although the plaintiffs there had contended that

the Supreme Court's decisions in Guardians Association v. Civil Service Commission, 463 U.S. 582 (1983), and
Alexander v. Choate, 469 U.S. 287 (1985), establish the existence of a private right of action under the regulations,
we rejected that contention. We noted that although five Justices implicitly endorsed the existence of a private right
of action in those cases, the Supreme Court never directly addressed the issue. See Chester Residents, 132 F.2d at
929-33.

We also rejected the suggestion of the defendants that our discussion in Chowdhury v. Reading Hospital and
Medical Center, 677 F.2d 317 (3d Cir. 1982), regarding the requirements for a claim of intentional discrimination
under section 601 of Title VI necessarily means that there is no private right of action under section 602 of the Act.
We thus found no direct authority confirming or denying a private right of action under the Title VI regulation.
Chester Residents, 132 F.3d at 931.

We then proceeded to apply the Angelastro analysis to decide whether such a right of action should be inferred. In
Angelastro, we applied a three-pronged test in"[d]eciding whether to imply a private right of action from an agency
rule." First, a court must ascertain whether a private right of action exists under the statute under which the rule was
promulgated. See id. "If under Cort v. Ash and its progeny, a court finds that Congress did not intend the
statute to be enforced by private actions, then the inquiry is concluded." Id. Otherwise, two further inquiries must
be made: "whether the agency rule is properly within the scope of the enabling statute" and "whether implying a
private right of action will further the purposes of the enabling statute." Id.

In Chester Residents, we quickly resolved the inquiry into the second and third prongs of Angelastro. We
determined that the agency rule is properly within the scope of Title VI because in its unanimous opinion in
Alexander the Supreme Court stated that " `actions having an unjustifiable disparate impact on minorities [can] be
redressed through agency regulations designed to implement the purposes of Title VI.' " Chester Residents, 132
F.3d at 933 (alteration in original) (quoting Alexander, 469 U.S. at 293).

We also concluded that the third prong -- whether implying a private right of action under the disparate impact
regulations will further the purposes of Title VI -- was also satisfied. Title VI's purposes are to"(1) combat
discrimination by entities who receive federal funds; and (2) provide citizens with effective protection against
discrimination." Id. at 936 (citing Cannon v. University of Chicago, 441 U.S. 677, 704 (1979)). Therefore, we

reasoned, "a private right of action will increase enforcement," and we concluded that such increased enforcement will further Title VI's purposes, compensating for the agency's lack of sufficient resources to adequately enforce the regulation itself. Chester Residents, 132 F.3d at 936.

The Angelastro prong to which we devoted the most attention in Chester Residents was the first inquiry, which asks whether the statute under which the regulation was promulgated (here Title VI) properly permits the implication of a private right of action. We analyzed this prong in Chester Residents in terms of the Cort factors and determined that the Title VI regulations create federal rights in favor of individual plaintiffs (the first Cort factor), and that "there is some indication in the legislative history . . . of an intent to create a private right of action" (the second Cort factor). See Chester Residents, 132 F.3d at 933 n.10, 934. We further held that implying a remedy for the plaintiffs is consistent with the underlying purposes of the legislative scheme (the third factor), reasoning:

The procedural requirements in section 602 provide a fund recipient with a form of notice that the agency has begun an investigation which may culminate in the termination of its funding. We note that a private lawsuit also affords a fund recipient similar notice. If the purpose of the requirements is to provide bare notice, private lawsuits are consistent with the legislative scheme of Title VI. Furthermore, unlike the EPA, private plaintiffs do not have authority to terminate funding. As a result, the purpose that the requirements serve is not as significant in private lawsuits, where the potential remedy does not include the result (i.e., termination of funding) at which Congress directed the requirements. Stated differently, the requirements were designed to cushion the blow of a result that private plaintiffs cannot effectuate.

Id. at 935-36 (footnote omitted). Finally, the last Cort factor -- whether the cause of action is one traditionally relegated to state law, in an area basically the concern of States -- was deemed "irrelevant because Title VI is federal law." Id. at 933 n.10.

We need not take this somewhat circuitous route to analyze the first Angelastro factor in the inquiry we make here. In Angelastro, we explained that the initial inquiry focuses on whether the statute implemented by the regulation contains an implied private right of action: "Where the enabling statute authorizes an implied right of action, courts should permit private suits under agency rules within the scope of the enabling statute if doing so is not at variance with the purpose of the statute. . .. [I]f Congress intended to permit private actions for violations of the statute, `it

would be anomalous to preclude private parties from suing under the rules that impart meaning to the statute.' " 764 F.2d at 947. As noted above, the regulation at issue here, although promulgated by the Department of Education under section 602 of Title VI, implements section 601 of Title VI. See 42 U.S.C. § 2000d-1 (authorizing regulation "to effectuate the provisions of section 2000d of . . . title [42]"). The Supreme Court precedent and our cases firmly establish that section 601 of Title VI gives rise to an implied right of action, at least for purposes of securing injunctive relief. See Guardians, 463 U.S. at 593-95 (Opinion of White, J.); Cannon, 441 U.S. at 694-703, 710-16; Cheyney State College Faculty v. Hufstedler, 703 F.2d 732, 737 (3d Cir. 1983); NAACP v. Medical Ctr., Inc., 599 F.2d 1247, 1248, 1250 n.10 (3d Cir. 1979). It therefore follows that the first prong of Angelastro is satisfied. We are persuaded by the analyses in Chester Residents that the second and third prong of Angelastro are also met.

Our conclusion is in keeping with the decisions of the other courts of appeals that have addressed this issue. The Eleventh Circuit has explicitly "recognized an implied private right of action to enforce the regulations promulgated under section 602 of Title VI," thereby permitting private plaintiffs to "obtain injunctive or declaratory relief by showing, inter alia, that the challenged action has `a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory.' " Burton v. City of Belle Glade, No. 97-5091, 1999 WL 425895 (11th Cir. June 25, 1999) (quoting Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993)); see also Georgia State Conference, 775 F.2d at 1417. At least four other federal courts of appeal have reached the merits of disparate impact claims brought by individual plaintiffs under the Title VI regulations, although without explicitly determining whether a private right of action exists thereunder. See Villanueva v. Carere, 85 F.3d 481, 486-87 (10th Cir. 1996) (affirming refusal to grant preliminary injunction on grounds that disparate impact had not been adequately shown); New York Urban League, Inc. v. New York, 71 F.3d 1031 (2d Cir. 1995) (same); City of Chicago v. Lindley, 66 F.3d 819, 827-30 (7th Cir. 1995) (affirming grant of summary judgment to defendant on ground that disparate impact had not been adequately shown); Larry P. by Lucille P. v. Riles, 793 F.2d 969 (9th Cir. 1984) (affirming judgment for plaintiff on disparate impact claim following trial).

Defendants nevertheless argue that interpreting the Title VI regulation to provide a private right of action would contravene the Supreme Court's pronouncement in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), that administrative regulations may not create federal law. There the Court stated, "The rulemaking power granted to an

administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." See id. at 213-14 (internal quotation marks omitted). Defendants argue that because the Title VI regulation extends the conduct prohibited by Title VI to encompass disparate impact discrimination, whereas Title VI prohibits only intentional discrimination, a holding that private suits may be brought under the regulation would effectively permit administrative agencies to create substantive law.

Defendants' argument conflicts with the Supreme Court's own pronouncements. As previously noted, in Guardians five of the nine justices agreed that the administrative regulations incorporating a disparate impact standard are valid, see 463 U.S. at 584 n.2, 607 n.27, and thereafter the Court in Alexander characterized Guardians as so holding. See Alexander, 469 U.S. at 293 ("[Guardians held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI"). Obviously, the Supreme Court did not believe that administrative regulations that prohibit disparate impact were an impermissible creation of substantive law, even though in its own earlier opinion in Guardians the Supreme Court had held that Title VI itself did not extend that far. See also United States v. O'Hagan, 521 U.S. 642, 672-73 (1997) (sustaining SEC regulation that prohibits more activities than statute on ground that "[a] prophylactic measure, because its mission is to prevent, typically encompasses more than the core activity prohibited").

Moreover, numerous other appellate decisions have implied private rights of actions under regulations under similar circumstances. See, e.g., Lowrey v. Texas A&M University System, 117 F.3d 242 (5th Cir. 1997) (Department of Education regulations promulgated under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq.); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530 (9th Cir. 1984) (Securities and Exchange Commission Rule 10b-16, 17 C.F.R. § 240.16). In each of these cases, the analysis as to whether there was a private right of action to enforce the regulation at issue would not have been necessary if the regulation did not go further than that statute; the private right of action under the particular statute alone would have sufficed.

We therefore reject defendants' arguments that Count I of this complaint does not state a claim under the Department of Education regulation. We do not decide whether every allegation of Count I of the complaint states a viable claim under the Title VI regulation. Because the District Court misread the thrust of the complaint, it never

parsed the allegations to ascertain how and whether they differ. We do not suggest that the complaint be dissected upon remand. We merely decide that there is at least one viable claim and that plaintiffs should be permitted to proceed to discovery after answers have been filed.

C.

Plaintiffs' second count invokes one of the Civil Rights Acts, 42 U.S.C. § 1983, to redress the defendants' alleged violation of the regulation. Section 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in a[ ] . . . proper proceeding for redress.

The District Court properly interpreted this statute to mean that "[a] § 1983 action has two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived a [citizen or other] person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Powell, slip op. at 12 (emphasis added).

The District Court pretermitted any analysis of whether the complaint adequately alleges that the defendants deprived any person of rights secured by the laws of the United States within the scope of § 1983 because it held that the four defendants cannot be sued under that statute. First it held that "[a]s officials of the Commonwealth of Pennsylvania who have been sued for actions taken while in their official capacities, Ridge, Hickok and Hafer are not `persons' under § 1983." Id. at 14. Then it held that Gallagher, who was sued solely for actions taken in his official capacity as the chairperson of the Commonwealth's Board of Education, is not a "person" who may be sued under § 1983 because the Board's funding comes directly from the Commonwealth and it is therefore "an arm of the state" immune from suit. Id. The District Court's conclusions contravene the applicable Supreme Court precedent. When state officials are sued in their official capacities for damages, that suit is treated as one against the state and the official is not considered to be a "person." See Will v. Michigan Dept. of State Police, 492 U.S. 58, 71 & n.10 (1989). Hence, § 1983 cannot be invoked. On the other hand, when the § 1983 suit seeks damages against the state officials in their individual or personal capacities, it may be maintained (subject to any applicable

immunity doctrine) even though they acted in their official capacities in the matter at issue. See Hafer v. Melo, 502 U.S. 21, 27 (1991) ("A government official in the role of personal-capacity defendant . . . fits comfortably within the statutory term `person' ").

A suit for damages must be contrasted with a suit for equitable relief. The Supreme Court has held that a state official sued for injunctive relief is a "person" under § 1983 because an action for prospective relief is not treated as a suit against the state. See Will, 491 U.S. at 71 n.10 ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because `official-capacity actions for prospective relief are not treated as actions against the State.' " (quoting Kentucky v. Graham, 473 U.S. 19, 167 n.14 (1985)); see also Edelman v. Jordan, 415 U.S. 651, 666-74 (1974) (discussing Ex parte Young, 209 U.S. 123 (1908)).

The complaint in this case seeks only the equitable remedies of an injunction and declaratory relief. The conclusion that Ridge, Hickok, Hafer, and Gallagher are persons within the meaning of § 1983 is thus inescapable.

Perhaps not surprisingly, defendants have chosen not to defend the District Court's reasoning, arguing instead that the District Court's decision may be upheld on another ground. Notwithstanding our general reluctance to venture into areas the District Court did not consider, we consider this issue now as a matter of judicial expediency because the case will be remanded and it will undoubtedly arise again.

Defendants first argue that Title VI's "comprehensive enforcement scheme" precludes a § 1983 claim. Once a plaintiff has identified a federal right that has allegedly been violated, there arises a "rebuttable presumption that the right is enforceable under § 1983." Blessing v. Freestone, 520 U.S. 329, 341 (1997). The presumption is rebutted "if Congress `specifically foreclosed a remedy under § 1983' . . . [either] expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Id. (quoting Smith v. Robinson, 468 U.S. 992, 1005 n.9 (1984)).

Neither Title VI nor the regulation promulgated thereunder purports to restrict the availability of relief under § 1983. Defendants thus "must make the difficult showing that allowing a § 1983 action to go forward in these circumstances `would be inconsistent with Congress' carefully tailored scheme.' " Id. at 346 (quoting Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107 (1989)).

Only twice has the Supreme Court found a remedial scheme sufficiently comprehensive to supplant§ 1983. See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1 (1981); Smith v. Robinson , 468 U.S. 992 (1984). In both instances, the Supreme Court emphasized that the statutes that were held to be displaced themselves specifically provided aggrieved individuals with extensive statutory remedies. However, the Supreme Court has cautioned that "a plaintiff's ability to invoke § 1983 cannot be defeated simply by `[t]he availability of administrative mechanisms to protect plaintiff 's interests.' " Blessing, 520 U.S. at 347 (quoting Golden State, 493 U.S. at 347). On at least three occasions the Court found that an agency's authority to cut off federal funding was insufficient to justify the denial of a § 1983 remedy. See Wright v. City of Roanoke Redevelopment and Housing Auth., 479 U.S. 418, 428 (1987); Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 521–22 (1990); Blessing, 520 U.S. at 347–48.

Cognizant of this guidance, we see no reason to hold that resort to § 1983 has been foreclosed here. Neither Title VI nor the Department of Education regulation establishes "an elaborate procedural mechanism to protect the rights of [individual plaintiffs]," as did the statute at issue in Smith, where the Court stated, "The [Act's] procedures . . . ensure that hearings [are] conducted by the state[and that these hearings are] fair and adequate," 468 U.S. at 1010–11 (interpreting the Education of the Handicapped Act, 84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq.).  Nor is it possible to describe the administrative remedies Title VI and the regulations establish as "unusually elaborate," as the Court described the enforcement provisions of the pollution control statutes at issue in Sea Clammers. See 453 U.S. at 13. Indeed, the statutory scheme under Title VI does not specifically provide individual plaintiffs with any administrative remedy. See Chowdhury, 677 F.2d at 319 (noting that under the administrative enforcement mechanism Congress provided in section 602 of Title VI, "an aggrieved individual may file a complaint with the funding agency but has no role in the investigation or adjudication, if any, of the complaint" (footnotes omitted)).

Defendants nonetheless contend that we are constrained to hold that plaintiffs' claim under § 1983 may not coexist with Title VI because of our decisions in two Title IX cases: Williams v. School District, 998 F.2d 168 (3d Cir. 1993), and Pfeiffer v. Marion Center Area School District, 917 F.2d 779 (3d Cir. 1990). In Williams, a male student brought suit alleging that the defendants violated Title IX by excluding him from the girls' field hockey team. Williams' complaint also stated a claim under § 1983 and the Equal Protection Clause. On appeal, we reversed the grant of

summary judgment to Williams on the Title IX claim, holding that disputed issues of material fact remained. We also vacated the district court's judgment for plaintiff on his constitutional claims brought under § 1983. We held that the district court should have refrained from deciding the plaintiff 's § 1983 action in keeping with"the Supreme Court's admonition that courts should exercise restraint before reaching federal constitutional claims." Williams, 998 F.2d at 176.

In Williams, we relied on our earlier opinion in Pfeiffer, where we upheld the district court's decision not to reach plaintiff 's constitutional claims of gender discrimination brought under § 1983 once it had decided that Pfeiffer's constitutional claims were "subsumed" within her Title IX claim.

Defendants contend that these cases stand for the broad proposition that all § 1983 claims are precluded by Title IX and argue that Title VI must be similarly interpreted. Those decisions cannot be interpreted that broadly. They concerned the interaction between a plaintiff 's constitutional claims and statutory claims, and the holdings were predicated on the principle that courts should refrain from deciding constitutional issues unnecessarily. For example, in Williams we stated that the proper course in Pfeiffer was for the district court to "refuse[ ] to hear plaintiff 's section 1983 claim." Williams, 998 F.2d at 176 (emphasis added). Similarly, we described ourselves as "not reach[ing] the constitutional issues" Williams sought to raise. Id. (emphasis added). We vacated the district court's §1983 ruling, rather than reversing it or remanding for further proceedings. Those holdings and pronouncements are consistent with the prudential imperative not to resolve a constitutional issue unnecessarily. They do not suggest, as defendants state, that there can never be a § 1983 claim for violation of Title IX.

Most important here is that plaintiffs do not invoke § 1983 to redress a constitutional claim but instead a claim under federal law. Thus, the principle that courts should avoid deciding constitutional claims whenever possible is inapplicable. We therefore reject defendants' contention that our decision here is controlled by these past precedents. Instead, we hold that a § 1983 suit is not incompatible with Title VI and the Title VI regulation. At oral argument, plaintiffs' counsel recognized that at some point in the litigation it may develop that it is not necessary to maintain both the claim evolving from Title VI and the § 1983 claim, and the approach taken in Pfeiffer and Williams may be appropriate. We agree that no more is required now.

D.

Finally, the legislative intervenor defendants question the plaintiffs' standing to maintain each count of their complaint on the ground that plaintiffs' injury is not likely to be redressed by court action. In order to have standing under the Constitution,

a plaintiff must show (1) an actual injury that is (2) causally connected to the conduct complained of and (3) likely to be "redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560– 61 (1992) (internal quotation marks omitted). The injury must consist of "an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (citations and internal quotation marks omitted).

The legislative defendants contend that any injury the plaintiffs may have suffered is not redressable because "approximately half of the funds received by the School District are from local sources not controlled by the Executive Branch Defendants," who presumably are free to decrease their contribution for public education. Legislative Defendants' Br. at 35. The legislative defendants therefore conclude that, under those circumstances, the court's order would not redress the plaintiffs' injury, and hence they have no standing.

We reject the defendants' contention because their argument implicitly mischaracterizes plaintiffs' injury. The legislative defendants err in assuming that the injury in this case consists of a lack of adequate funding. Here, the plaintiffs complain that non-white school children in Pennsylvania receive less favorable treatment than their white counterparts because the state funds the school districts most of them attend at a lower level than it does the school districts most white school children attend. A court order directing the state to equalize funding between these school districts would redress this comparative injury, even if other sources of the school district's income were simultaneously reduced. We therefore conclude that the school children's injury is redressable by court order.4

The concept of standing also encompasses prudential limits on federal-court jurisdiction. See Warth v. Seldin, 422 U.S. 490, 498 (1975). Courts require plaintiffs to satisfy certain prudential concerns in an effort "to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99–100 (1979). Thus, they require (1) that the injury alleged not be a "generalized grievance" that is "shared in substantially equal measure by all or a large class of citizens," (2) that the plaintiff assert his/her own legal rights rather than those of other parties, and (3) that "the plaintiff 's complaint . . . fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 474–75 (1982) (internal quotation marks omitted).

Not all plaintiffs must meet the prudential standing requirements imposed by courts. Congress may legislatively direct that standing under a particular act is to be limited only by Article III. See Gladstone, Realtors, 441 U.S. at 100; Fair Housing Council v. Montgomery Newspapers, 141 F.3d 71, 75 (3d Cir. 1998).

---

4. Moreover, plaintiffs take the position that the Commonwealth is responsible for all of the School District's funding. We need not decide that issue in order to hold that plaintiffs have adequately pled standing.

In such case plaintiffs may" `seek relief on the basis of the legal rights and interests of others, and . . . may invoke the general public interest' " in support of their claim. Fair Housing Council, 141 F.3d at 75 (quoting Warth, 422 U.S. at 500).

The defendants contend that the City of Philadelphia, the School District of Philadelphia, the Board of Education of the School District of Philadelphia, and the individual officers (collectively, the "City and School District plaintiffs") lack prudential standing because they are not asserting their own legal rights, but rather those of other parties. The legislative defendants argue that the City and School District plaintiffs are not "person[s]" within the meaning of Title VI and that, therefore these plaintiffs have no rights of their own under that statute. The District Court accepted this contention and dismissed the complaint as to the City and School District plaintiffs. The plaintiffs challenge that dismissal on appeal.

A determination of the standing of the City and School District plaintiffs at this time would involve us in a complex issue that may have no practical significance. We note in this regard that the defendants do not challenge the prudential standing of the school children, and those plaintiffs plainly meet the constitutional standing requirements. Thus, there are individual plaintiffs in this case who will carry the suit forward in any event.

Nor can there be serious question about the standing of the organization plaintiffs, which the executive defendants have not challenged. The standing of the plaintiff organizations to bring this suit is consistent with the long line of cases in which organizations have sued to enforce civil rights, civil liberties, environmental interests, etc. See Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 308 (1985); Havens Realty Corp. v. Coleman , 455 U.S. 363, 369 (1982); Andrus v. Sierra Club, 442 U.S. 347, 352, 353 & n.8 (1979); Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994); Medical Ctr., Inc., 657

F.2d at 1322.

Therefore, this situation is analogous to that presented in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977). There, a real estate development corporation challenged the local authority's refusal to rezone a particular parcel of land to allow the construction of racially integrated housing. The Supreme Court found that the corporation met the constitutional standing requirements but was less certain that the corporation met prudential standing requirements given that the corporation had not itself been discriminated against on the basis of race. The Court held that it need not decide the prudential standing question because another of the plaintiffs, an individual, had suffered the discrimination directly. See id. at 264 & n.9.

We likewise conclude that we need not decide whether the City and School District plaintiffs meet prudential standing requirements because the individual school children, who have allegedly suffered discrimination directly, and the plaintiff organizations may properly bring this controversy before the federal courts.

III.

As we have stated earlier, we take no position on the merits of the allegations of the complaint. It is indeed a serious matter for plaintiffs to charge that the practices of the Commonwealth of Pennsylvania in funding public schools have a racially disparate effect. But if the charge is serious, so are the inevitable effects if the charge turns out to have merit. We need no long list of citations to note the widespread recognition of the importance of a good public school education for all of our young people -- rich and poor, black and white. Horace Mann, the great educator, wrote "Education, . . . beyond all other devices of human origin, is the great equalizer of the conditions of men, -- the balance-wheel of the social machinery."

We will reverse the order of the District Court dismissing the complaint, and remand for further proceedings consistent with this opinion.

A True Copy: Teste:

Clerk of the United States Court of Appeals for the Third Circuit