LIBERTY RESOURCES, INC. and
Consumer Connection,
Plaintiffs,

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY,
Defendant.

No. CIV. A. 99–4837.

United States District Court,
E.D. Pennsylvania.

Jan. 5, 2001.

Stephen F. Gold, Philadelphia, Pa, Thomas H. Earle, Robin Resnick, Disabilities Law Project, Philadelphia, PA, for plaintiffs.

Bradley K. Moss, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA, for defendant.

Steven E. Butler, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for movant.

## MEMORANDUM

LOWELL A. REED, JR., Senior District Judge.

Presently before this Court are the cross-motions of plaintiffs Liberty Resources, Inc. ("LRI") and Consumer Connection (Document No. 9) and defendant Southeastern Pennsylvania Transportation Authority ("Septa") (Document No. 10), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and the responses thereto. The gravamen of this law suit is plaintiffs' claim that the number and nature of trip denials issued by Septa to disabled persons constitutes a violation of Title II of the Americans with Disabilities Act of 1990, 104 Stat. 337, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 87 Stat. 394, 29 U.S.C. § 794. Plaintiffs request equitable and declaratory relief. Pursuant to Federal Rule of Civil Procedure 42(b), I will bifurcate this law suit and rule today only on the issue of liability. Accordingly, upon consideration of the cross-motions for summary judgment, I will grant plaintiffs' motion with respect to liability and deny without prejudice plaintiffs' motion with respect to remedies and will deny defendant's motion.[1]

## I. BACKGROUND[2]

Defendant Septa is a statecreated instrumentality that provides public transportation services to individuals in Southeastern Pennsylvania. Septa receives federal monies from the Federal Transit Administration of the United States Department of Transportation. Septa operates a fixed route public transportation system that includes bus lines and rail services and runs according to fixed schedules. In addition, pursuant to 42 U.S.C. § 12143, Septa operates a paratransit system in Philadelphia and several surrounding counties.[3]

Plaintiff LRI is a non-profit corporation located in Philadelphia, Pennsylvania. LRI is a designated center for independent living ("CIL"). CILs are community-based organizations established under the Rehabilitation Act, 29 U.S.C. §§ 796f–1–796f–4, to advocate for the civil rights of individuals with disabilities and improve their lives to enable them to live with greater independence. LRI receives fed-

---

1. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

2. Except where indicated otherwise, the following facts are taken from the parties' joint stipulation of facts. (*See* Pls.' Ex. A. to Pls.' Mot. for Summ. J. ("Stipulation"))

3. "Paratransit" is defined in the federal regulations as "comparable transportation service required by the ADA [Americans with Disabilities Act] for individuals with disabilities who are unable to use fixed route transportation systems." 49 C.F.R. § 37.3.

eral and state funding, as well as grants and donations from private sources, to provide its services. One of LRI's missions is to eliminate transportation barriers for Philadelphia-area residents with disabilities. In addition to this effort, LRI works on the following issues on behalf of the disabled: advocating for affordable and accessible housing, providing personal assistance (attendant care), transitioning individuals from nursing facility care to community programs, advocating for community services and for the rights of those disabled persons living in nursing facilities, as well as providing information and referral, outreach and educational services.

Plaintiff Consumer Connection has about 75–80 members who are individuals with disabilities in the Philadelphia area. Plaintiffs describe Consumer Connection as an "unincorporated association" (Pls.' Mem. of Law in Opp'n. to Def.'s Mot. for Summ. J. and Reply in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem. II") at 4) that advocates on issues that affect individuals with disabilities, including transportation, housing, health care, and personal assistance services.

Plaintiffs filed this law suit alleging that Septa fails to provide paratransit services as mandated by Title II of the Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). (Compl. at ¶ 1.) The parties have stipulated to the data regarding the number of paratransit rides that are denied to individuals with disabilities. These denials are commonly referred to as "trip denials." The crux of the parties' dispute for the purposes of this motion is whether or not the number and nature of

trip denials constitutes a violation of either the ADA or Section 504.

In Philadelphia, Septa provides paratransit services to "ADA-eligible riders." These are riders with disabilities who are eligible for paratransit services under the ADA and Section 504. *See* 49 C.F.R. § 37.123. In Philadelphia, Septa also voluntarily provides paratransit services through its Shared Ride Program ("SRP") to individuals who are 65 or older. Septa is not obligated by statute to provide paratransit services to SRP patrons. Of the total paratransit rides provided by Septa, 50–55% are for SRP riders and 45–50% are for ADA-eligible riders.

The paratransit system provides rides twenty-four hours per day, seven days per week. The centralized reservation system is open Monday through Friday from 7:00 a.m. to 4:00 p.m. and Saturday and Sunday from 7:30 a.m. to 4:00 p.m. Paratransit service is provided on a first-come, first-serve basis to both ADA-eligible and SRP riders. There are two types of ride requests. First, patrons can request a "standing order" which refers to a request for paratransit service that a rider needs on known and regularly repeated times on an ongoing basis. A rider need only call once for such a request. Second, patrons can request a "demand ride" which refers to all other types of trip requests. As mandated by 49 C.F.R. § 37.131(b)(2), Septa is to schedule any requested ride within a two-hour window.[4] The patron's request for a ride may be made anytime between one day and seven days before the date of the requested ride.

Septa owns and leases 321 vehicles to provide paratransit service in Philadel-

---

4. Specifically, 49 C.F.R. § 37.131(b)(2) reads: "The entity may negotiate pickup times with the individual, but the entity shall not require an ADA paratransit eligible individual to schedule a trip to begin more than one hour before or after the individual's desired departure time."

phia.[5] On an average day, 278 of the 321 vehicles, which are commonly referred to as "tours," are used to provide rides.[6] Of the remaining 43, 6 to 30 are not available due to mechanical problems or preventative maintenance.[7] On Saturdays, approximately 85 vehicles are used; on Sundays, approximately 67 vehicles are used.

Septa provided monthly charts detailing trip denials for the period between May 1999 and May 2000, inclusive. These charts relate only to ADA paratransit service and do not include data regarding SRP paratransit service. During this 397 day period, there were 1,050,770 rides requested.[8] Of these trip requests, 460,846 consisted of standing orders and 589,924 consisted of demand rides. Over this 13-month period, there were 29,472 "capacity trip denials." These denials occur when an ADA-eligible paratransit rider requests a ride and Septa is unable to schedule that ride within the two-hour window because all of the available seats are taken by persons who have made prior reservations. Because standing orders are pre-arranged, a capacity trip denial can only be for a demand (i.e., non-standing) ride. The 29,472 capacity trip denials translates into on average daily rate of 74 denials. Statistically, 2.8 percent of total trip requests result in capacity trip denials and 5 percent of demand trip requests result in capacity trip denials.[9]

---

5. Recently, two (2) vehicles were taken out of service because of accidents and are due to be replaced, which will increase the total number of vehicles to 323.

6. In or around January, 2000, Septa increased the number of tours from approximately 250 to 278. Septa occasionally increases the number of tours for unique events that trigger high demand (e.g., celebrations of the anniversary of the ADA).

7. It is unclear why the remaining 7 to 37 vehicles are not used.

8. Parties often refer to requests for rides as "trips scheduled." In order to avoid confusion to future readers, I will uniformly use the term "trip request" instead of "trip scheduled."

9. Septa provided and stipulated to the above data regarding trip denials. (*See* Attachments 1–5 of Stipulation.) Defendant now argues that due to cancellations and scheduling changes, a ride may become available after a capacity denial has been issued. (Def.'s Mem. at 4.) As a result, patrons may call for a reservation for the same request after being denied a ride. (*Id.*) Each denial is recorded as a "capacity denial" even though the patron requested an identical ride. (*Id.*) Therefore, the number of denials is greater than the actual number of requested rides. (*Id.*)

In Defendant's first Memorandum of Law submitted to the Court, Septa offers no data supporting the exact or approximate number of times such "duplicate" denials are issued. In Defendant's Reply Memorandum, Septa brings forth new data through the affidavit of Richard D. Krajewski, the manager of technical analysis for Septa's Customized Community Transportation Division, indicating that 30 percent of the reported 29,472 capacity denials were duplicate rides. (Ex. A to Def.'s Reply.) This, defendant contends, translates to 8,885 duplicate rides which reduces the capacity denials to 20,587 and a 1.96 percent denial rate. (*See* Def.'s Reply at 5.)

Thus, in essence, defendant attempts to no longer be bound by its prior stipulation that Septa issued 29,472 capacity denials, i.e., if this Court were to accept Septa's newly presented data, then this Court would be ignoring the already stipulated-to data. The Court of Appeals for the Third Circuit has determined that a party may be freed from a stipulation to prevent a "manifest injustice." *Waldorf v. Shuta*, 142 F.3d 601, 617–18 (3d Cir. 1998) (discussing four factors for consideration). Septa has failed to present to this Court any reason that it should be freed from its stipulation. Therefore, this Court will proceed on the facts and data presented by the prior stipulation. For reasons which will be clear, if this new data were not successfully challenged on the merits by plaintiffs or were accepted by this Court, the results of this adjudication would not change.

During the thirteen-month period, there were 89,131 next-day trip requests, i.e., trip requests for paratransit rides that are made by ADA-eligible paratransit riders on the day before the day of the requested ride. These requests fall into the demand ride category, not the standing order category. Of these requests, 11,948, or 13.4 percent, resulted in capacity trip denials. That data means that on an average day, 30 next-day rides were denied. During this period, there were 112,334 total weekend trip requests that resulted in 8,517, or 7.6 percent, capacity trip denials. That data means that on an average weekend day, 75 rides were denied. Also during this period, there were 290,092 total peak-service hour demand requests on weekdays which netted 18,569, or 6.4 percent, of capacity trip denials. That data means that on an average day, 66 peak-hour rides were denied.

Septa stipulated to the fact that it would be able to provide more services to ADA-eligible patrons if it had additional vehicles, drivers, and funds to pay for them. Cheryl Y. Spicer ("Spicer"), Septa's Chief Operating Officer, testified at her deposition that there were no forces outside of Septa's control that caused trip denials to be issued. (Dep. Test. of Spicer at 145–46.) Septa has never requested an undue burden waiver from the Department of Transportation.[10] Septa has never conducted a study to determine if reducing the time in which riders may make advance reservations would eliminate capacity trip denials. Nor has Septa determined how much additional funding would be needed in order to meet the full demand for paratransit service. Currently, Septa determines its budget based on the number of trips Septa actually provides. This calculation excludes trip denials.

The Federal Transit Administration ("FTA") of the United States Department of Transportation, after reviewing Septa's paratransit budget and operations in March 2000, recommended that Septa include the number of trip denials when projecting paratransit volume in calculating its budget. Septa will be adjusting its budget request in the upcoming fiscal year; however, it will continue to assume a 2 percent to 3 percent trip denial rate.[11] Septa has not requested additional vehicles since Fiscal Year 1997–1998, which ended on June 30, 1998.[12] The budget for Fiscal Year 2000–2001, which began on July 1, 2000, does not include funds to increase the total number of paratransit vehicles. Septa will replace about 60 current vehicles during Fiscal Year 2000–2001.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

According to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment if "... the pleadings, depositions, answers to inter-

10. The ADA includes the following section:

> The regulations issued under this section shall provide that, if the public entity is able to demonstrate to the satisfaction of the Secretary that the provision of paratransit and other special transportation services otherwise required under this section would impose an undue financial burden on the public entity, the public entity, notwithstanding any other provision of this section (other than paragraph (5)), shall only be required to provide such services to the extent that providing such services would not impose such a burden.
>
> 42 U.S.C. § 12143(c)(4).

11. It is unclear why Septa has rejected the advise of FTA.

12. It is unclear whether this stipulated fact means that Septa has not recently requested that additional vehicles be operating on a daily basis or if it means that Septa has not recently requested more vehicles be added to Septa's fleet.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must make its determination after considering the facts and all reasonable inferences drawn from them in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The Court may not resolve factual disputes between the parties. *See Linan–Faye Constr.Co., Inc. v. Housing Auth. of Camden*, 49 F.3d 915, 926–27 (3d Cir.1995). When opposing parties file cross-motions for summary judgment, the court must consider each motion separately, and "each side must still establish a lack of genuine issues of material fact and that it is entitled to judgment as a matter of law." *United States ex rel. Showell v. Philadelphia AFL–CIO Hospital Ass'n.*, Civ. No. 98–1916, 2000 WL 424274, at *1 (E.D.Pa. Apr.18, 2000) (quoting *Nolen v. Paul Revere Life Ins. Co.*, 32 F.Supp.2d 211, 213 (E.D.Pa.1998)) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). Where, as here, parties have stipulated to all relevant facts regarding liability and the sole dispute concerns conflict-ing statutory interpretations, summary judgment is appropriate. See *Estate of Reddert v. United States*, 925 F.Supp. 261, 265 (D.N.J.1996); *see also, Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) ("summary judgment is proper where the facts are undisputed"); *Graham v. Liberty Mutual Group*, No. Civ. A. 97–4507, 1998 WL 961376, at *2 (E.D.Pa. Dec.15, 1998).

## III. DISCUSSION

### A. Standing

■ An association or organization may gain standing by suing based on injuries to itself, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 75 (3d Cir.1998) or based on injuries to its members or constituents. *See Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir.1997). Defendant attacks plaintiffs' standing on both fronts.[13]

**13.** Septa also raises two tangentially related arguments. First, Septa contends that LRI's President and Chief Executive Officer, Fern Moskowitz ("Moskowitz"), failed to obtain the permission of the LRI Board of Directors before filing the present action and therefore seems to argue that LRI lacks the authority to bring the present action. In response, plaintiffs filed a declaration signed under penalty of perjury by Joseph Pepe ("Pepe"), the Chair of LRI's Board, in which Pepe declares that (1) the Board understood that Moskowitz had the authority to file lawsuits to advance the goals of LRI when she deems such action appropriate; and (2) the LRI Board is aware of and fully supports (ratifies) the present litigation. (Pls.' Ex. A to Pls.' Mem. II.)

Therefore, I conclude that LRI has authority to bring the present lawsuit.

Second, Septa contends that Consumer Connection is not an unincorporated association, but rather an arm of LRI, and therefore may not be a party to the present action. As plaintiffs note, under Federal Rule of Civil Procedure 17(b), an unincorporated association may sue "in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States." The term unincorporated association "denotes a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." *Local 4076, United Steelworkers v. United Steelworkers, AFL–CIO,*

Septa challenges plaintiffs' standing in their own right on the sole ground that plaintiffs fail to produce sufficient evidence that they have suffered an injury. In order to address the merits of this argument, I find it necessary to review the law of standing with respect to associations and groups. Article III of the United States Constitution limits federal jurisdiction to "Cases" or "Controversies." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). At an "irreducible constitutional minimum," the plaintiff must be able to demonstrate:

> [First], an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged

action of the defendant, and not the result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61, 112 S.Ct. 2130 (citations omitted); *accord, Powell v. Ridge*, 189 F.3d 387, 403 (3d Cir.1999) (quoting same passage). In addition to this minimal constitutionally derived test, "the prudential doctrine of standing has come to encompass 'several judicially self-imposed limits on the exercise of federal jurisdiction.' " [14] *United Food and Commercial Workers Union v. Brown Group, Inc.*, 517 U.S. 544, 551, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)); *see also, Powell*, 189 F.3d at 404.[15] Congress may, however, "legislatively direct that standing under a particular act . . . be limited only by Article III."

---

327 F.Supp. 1400, 1403 (W.D.Pa.1971); *accord, Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir.1996).

Septa fails to raise a genuine issue of material fact as to whether Consumer Connection is an unincorporated association. In fact, the genesis of Defendant's evidence, e.g. that Consumer Connection "has no constitution, bylaws or articles of association," (Def.'s Mem. at 10), simply shows that Consumer Connection is not *incorporated*. Septa's reliance on a statement made by Linda Richman ("Richman"), the Vice President and Chief Operating Officer of LRI, at her deposition, meant to prove that Consumer Connection is only an arm of LRI, fails to raise an issue of material fact. Defendant argues that during Richman's deposition, she "acknowledged that Consumer Connection 'is really a consumer group associated with Liberty Resources.' " (*Id.* quoting dep. test. of Richman at p.40 ll. 1–5.) However, in the same breath, Richman testified that "Consumer Connection is an independent kind of entity." (*Id.*) Septa also stipulated to the fact that Consumer Connection is a membership organization with 75–80 members. (*See* Stipulation ¶ 50.) Therefore, I conclude that Consumer Connec-

tion has the capacity to bring the present lawsuit.

**14.** I raise the issue of prudential limits to standing *sua sponte*, as I am bound to independently ensure that all cases which come before me satisfy the rules of federal jurisdiction. *See e.g., FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir.1996).

**15.** These limits include:

> (1) that the injury alleged not be a 'generalized grievance' that is 'shared in substantially equal measure by all or a large class of citizens,' (2) that the plaintiff assert his/her own legal rights rather than those of other parties, and (3) that 'the plaintiff's complaint . . . fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' "

*Powell*, 189 F.3d at 404 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982)).

*Powell,* 189 F.3d at 404 (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)); *accord, Fair Housing Council v. Montgomery Newspapers,* 141 F.3d 71, 75 (3d Cir.1998).

In *Havens Realty,* the United States Supreme Court reaffirmed its previous holding that Congress intended the Fair Housing Act ("FHA"), 102 Stat. 1619, 42 U.S.C. § 3601 *et. seq.,* " 'to extend to the full limits of Art. III,' " thereby barring prudential limits. *Havens Realty,* 455 U.S. at 372, 102 S.Ct. 1114 (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 109, 99 S.Ct. 1601, 1609 n. 9, 1612, 60 L.Ed.2d 66 (1979)). The Court interpreted the FHA in such broad terms by focusing on the fact that the statute specifically grants standing to any "person aggrieved," which is statutorily defined as "any person." *See Gladstone,* 441 U.S. at 101, 108–09, 99 S.Ct. 1601; *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 208–09, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972).

Under the FHA, "the sole requirement for standing ... is the Art. III minima [sic] injury in fact—that the plaintiff allege that as a result of the defendant's actions he

has suffered 'a distinct and palpable injury.' " *Havens Realty,* 455 U.S. at 372, 102 S.Ct. 1114 (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)).

■ The Court of Appeals for the Third Circuit has not had the occasion to determine whether Congress enacted the ADA in such a way as to eliminate the judicially created prudential limits on standing. The majority of courts which have been confronted with this issue have held that the statute's broad language requires that only the minimal constitutional requirements be met. *See, e.g., Innovative Health Systems, Inc. v. White Plains,* 117 F.3d 37, 48 (2d Cir.1997); *Pathways Psychological Support Ctr. v. Leonardtown,* No. CIV. A. DKC99–1362, 1999 WL 1068488, at *3 (D.Md. Jul.30, 1999); *Discovery House, Inc. v. Consolidated City of Indianapolis,* 43 F.Supp.2d 997, 1007 (N.D.Ind.1999); *AIDS Healthcare Found. v. Belshe,* No. CV97–3235, 1998 WL 1157405, at *6 (C.D.Cal. Dec. 8, 1998); *Oak Ridge Care Ctr., Inc. v. Racine County, Wisconsin,* 896 F.Supp. 867, 872 (E.D.Wis.1995); *Raver v. Capitol Area Transit,* 887 F.Supp. 96, 98 (M.D.Pa.1995).[16] Therefore, I conclude

---

**16.** One Court in this Circuit, however, has taken the opposite view, holding that only disabled individuals, and not organizations or associations, may enjoy standing under the ADA. *See Kessler Inst. for Rehab. v. Mayor and Council of Essex Fells,* 876 F.Supp. 641, 653 (D.N.J.1995). In *Kessler,* the Court relied on the language found in 42 U.S.C. § 12132, which grants individuals with disabilities the right to be free from discrimination, and 42 U.S.C. § 12133, the enforcement provision, to conclude that the ADA narrowly confers standing only on disabled individuals. *See Kessler,* 876 F.Supp. at 653. Section 12132 reads, "no qualified *individual with a disability* shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C.

§ 12132 (emphasis added). Section 12133 reads, "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 [referring to the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to *any person* alleging discrimination on the basis of disability in violation of section 12132 of this title." 42 U.S.C. § 12133 (emphasis added). After simply reviewing the language in these two provisions, the Court in *Kessler* denied standing to a health care facility because the entity was not a disabled individual. *See Kessler,* 876 F.Supp. at 653.

The reasoning in *Kessler* is flawed for the following reasons. First, the enforcement provision of the ADA, like the FHA, broadly refers to "any person," not solely disabled individuals. *Cf. Helen L. v. DiDario,* 46 F.3d 325, 331 (3d Cir.1995), *cert. denied,* 516 U.S.

that Congress intended that standing under the ADA be limited only by the minimum constitutional constraints of Article III.

■ Under the Rehabilitation Act, "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 ... shall be available to *any person* aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C. § 794a (a)(2) (emphasis added). I am persuaded by those courts which have determined

that this broadly worded enforcement provision precludes the application of prudential limits.[17] *See e.g., Innovative Health,* 117 F.3d at 47; *Adapt v. Philadelphia Hous. Auth.,* No. Civ. A. 98–4609, 2000 WL 433976, at * 5 (E.D.Pa. Apr.14, 2000) Therefore, I conclude that prudential limits do not act as a bar to standing under the Rehabilitation Act.

I now turn to the merits of defendant's argument that plaintiffs lack standing in their own right because they failed to provide sufficient evidence indicating they

---

813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995) (characterizing overall language in Title II as "broad"). The Rehabilitation Act, incorporated in the enforcement provision, reads, "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 ... shall be available to *any person* aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C. § 794a (a)(2) (emphasis added). Thus standing under the Rehabilitation Act is dictated by Title VI which has clearly been held to allow organizations standing to bring suit. *See e.g., Powell,* 189 F.3d at 404; *cf. Innovative Health,* 117 F.3d at 47 (concluding that Congress intended standing under Rehabilitation Act be defined as "broadly as is permitted by Article III."); *Adapt v. Philadelphia Hous. Auth.,* No. Civ. A. 98–4609, 2000 WL 433976, at * 5 (E.D.Pa. Apr.14, 2000) (reaffirming prior holding that broadly worded enforcement provision of Rehabilitation Act precludes application of prudential standing requirement under Act).

Second, the Court in *Kessler* failed to address the regulations implementing Title II, which provide:

A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual *or entity* because of the known disability of an individual with whom the individual *or entity* is known to have a relationship or association.

29 C.F.R. § 35.130(g) (emphasis added). Further, the appendix to this section provides:

Paragraph (g), which prohibits discrimination on the basis of an individual's or entity's known relationship or association with an individual with a disability, is based on

sections 102(b)(4) and 302(b)(1)(E) of the ADA [which are part of Title I and Title III, respectively, of the ADA].... During the legislative process, the term "entity" was added to section 302(b)(1)(e) to clarify that the scope of the provision is intended to encompass not only persons who have a known association with a person with a disability, *but also entities* that provide services to or are otherwise associated with such individuals. *This provision was intended to ensure that entities* such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities *are not subjected to discrimination* because of their professional association with persons with disabilities.

29 C.F.R. pt. 35, App. D to 29, § 35.130(g) (1999) (emphasis added); *cf. Helen L. v. DiDario,* 46 F.3d 325, 331–32 (3d Cir.1995) (noting the controlling weight given to ADA regulations).

17. The Court of Appeals for the Third Circuit has held that where an environmental claim is brought, the standing requirements include demonstrating an injury in fact and that the interests being sought to protect are "arguably within the zone of interests to be protected by the act." *Shiffler v. Schlesinger,* 548 F.2d 96, 102 (3d Cir.1977); *accord, NAACP v. Medical Ctr.,* 584 F.2d 619, 625 n. 10 (3d Cir.1978). Even if standing under the Rehabilitation Act for non-environmental claims required this showing, the interest sought here, namely that Septa meet its paratransit mandate under the ADA and Section 504, is plainly within the zone of Section 504.

have suffered a "distinct and palpable injury." In *Havens Realty,* the United States Supreme Court held that "concrete and demonstrable injury to the organization's activities—with consequent drain of the organization's resources—constitute far more than simply a setback to the organization's abstract social interests." *Havens Realty,* 455 U.S. at 379, 102 S.Ct. 1114. The Court of Appeals for the Third Circuit noted in *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71, 76 (3d Cir.1998), that at the summary judgment stage, each element of standing must be met in the same manner as any other matter of which the moving party bears the burden of showing. In *Montgomery Newspapers,* the Fair Housing Council of Suburban Philadelphia ("FHC"), a nonprofit fair housing organization, argued that its mission suffered when it was forced to divert funds to an educational program, an investigation and litigation concerning advertisements in Montgomery Newspapers. *See id.* at 76.

The Court of Appeals determined that FHC failed to demonstrate that such efforts were implemented or to offer evidence that such efforts were even needed. *See id.* at 77. The Court found that the record failed to show that any resources were diverted to a "bona fide investigation." *Id.* at 78. In short, the Court of Appeals found a record devoid of injury as a result of the advertisements. *See id.* As to litigation costs, the Court of Appeals was persuaded by those courts holding that "litigation expenses alone" are insufficient to constitute damage necessary for standing. *Id.* at 79. Thus, the Court denied standing to FHC. *See id.* at 76; *see also, Fair Housing Council of Suburban Philadelphia v. Main Line Times,* 141

F.3d 439, 443 (3d Cir.1998) (determining that testimony by FHC Executive Director that continuing efforts to educate public "goes down the drain when these ads appear in the paper" fails to establish " 'causal connection between the injury and the [particular advertisements]' ") (alteration in original) (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130)); *but cf., Adapt,* 2000 WL 433976, at *6 (finding that substantial time in meetings and the like diverted resources from other areas of advocacy). Relying on *Montgomery Newspapers,* Septa argues that plaintiffs have failed to meet their burden because "the only documentation that the plaintiffs have provided is invoices from a paratransit carrier to LRI." (Def.'s Mem. at 18.)

I find that the record presented here is distinguishable from *Montgomery Newspapers* and disagree with Septa's characterization of plaintiffs' evidence at this stage of the litigation. Both LRI and Consumer Connection have spent time meeting with Septa personnel and Board members regarding paratransit service problems, as well as participating in protests concerning paratransit issues, including scheduling problems. (Stipulation ¶¶ 55, 56.) Both organizations also operate a "ParaTransit Hotline" to help individuals in reporting paratransit complaints. (Stipulation ¶ 57.) Septa stipulated that LRI has spent $10,630 to transport its staff, volunteers, and clients when they were unable to secure timely paratransit reservations from Septa. (Stipulation ¶ 48.) [18] Septa also stipulated that some clients have missed individual skills training due to paratransit problems and as a result LRI staff has needed to go to those clients' homes to conduct a training. (Stipulation ¶ 49.) In

18. LRI staff members, volunteers, and clients and Consumer Connection members include ADA-eligible riders. (Stipulation ¶¶ 47, 52.)

addition, Richman testified to the following at her deposition: (1) LRI staff has been unable to secure rides for volunteers; (*See* Dep. Test. of Richman at 70); (2) LRI staff who work in the personal assistance program, has been unable to schedule rides to visit clients in their Philadelphia homes; (*See* Dep. Test. of Richman at 89); (*see also* Dep. Test. of Moskowitz at 10–11); (3) LRI is unable to schedule bulk mailings on short notice because it relies on volunteers who are often unable to receive paratransit rides which means that paid staff must do work which should be done by volunteers; (*See* Dep. Test. of Richman at 84–85); (*see also* Dep. Test. of Moskowitz at 65–67); (4) at times, staff members who provide information and referral services, have been unable to get to work because Septa issued a trip denial and as a result work responsibilities needed to shift; (*See* Dep. Test. of Richman at 79); and (5) LRI would be more efficient and could redirect funds and efforts to other issues if the paratransit system were more reliable. (*See* Dep. Test. of Richman at 90–91.)

■ This uncontradicted laundry list of time spent and resources shuffled by these organizations is a far cry from the blank record FHC provided in *Montgomery Newspapers*. Unlike the plaintiff in *Montgomery Newspapers*, LRI and Consumer Connection have provided an undisputed record that shows a concrete and particularized injury, specifically, expending their own time and resources in a range of ways. Plaintiffs have further demonstrated that their injury has a causal connection with the conduct complained of, specifically, that Septa has violated the ADA and the Rehabilitation Act by issuing a substantial number of trip denials to their detriment. LRI and Consumer Connection have also shown that their injury would be redressed by favorable litigation. Plaintiffs have not made naked allegations, but rather, have presented uncontested deposition testimony, joint stipulations, and exhibits. Defendant has failed to provide *any* contradictory evidence. In sum, like the plaintiff in *Havens Realty*, the plaintiffs here have demonstrated a drain to their resources beyond simply harming their respective abstract missions. Therefore, I conclude that both LRI and Consumer Connection enjoy standing in their own right to pursue this lawsuit.[19]

## B.  Liability

In this case, the Court is asked to decide whether Septa's conduct constitutes a violation of the ADA and the Rehabilitation Act. This issue requires an in depth analysis of the ADA provision requiring public entities such as Septa to provide paratransit services. *See* 42 U.S.C. § 12143 ("Section 12143"). This Court has found no other court in this land which has faced this question nor any court which has closely examined Section 12143 and its accompanying regulations.[20]

19. Defendant also argues that plaintiffs lack representational standing. Specifically, Septa contends that plaintiffs may not bring this suit on behalf of their members and constituents because they failed to plead those grounds in their complaint. Because I conclude that both LRI and Consumer Connection have standing in their own right, I will not address the merits of Septa's alternative attack on plaintiffs' standing.

20. The Western District of Texas approved a proposed class action settlement agreement which addressed alleged deficiencies in the paratransit service offered in San Antonio. *See Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185 (W.D.Tex.1998). There, the court addressed whether the settlement was "fair, adequate and reasonable." *Id.* at 208. The court never analyzed the specific provisions of the ADA and the Rehabilitation Act which are

The congressional battle against discrimination of the disabled began with the passage of the Rehabilitation Act of 1973. *See* 29 U.S.C. § 794. Toward the close of the 1980s, the House and Senate began wrestling with the inadequacies of this landmark Act which culminated in the enactment of the ADA. *See Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir.1995), *cert. denied*, 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995) (citation omitted) (providing detailed history of acts). Improving transportation services for disabled persons is a key component of the ADA. *See* 42 U.S.C. § 12101. The House Committee on Education and Labor noted that "[t]ransportation is the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R.Rep. No. 485(II), at 37, (1990), reprinted in 1990 U.S.C.C.A.N. 303, 319 (observing that testimony of Executive Director of President's Committee on Employment of People with Disabilities echoed the same: "inaccessible transportation has been identified the major barrier, second only to discriminatory attitudes"); *accord*, H.R.Rep. No. 485(IV), at 25, (1990), reprinted in 1990 U.S.C.C.A.N. 512, 514 (Committee on Energy and Commerce noted that: "[Transportation] is a veritable lifeline to the economic and social benefits that our Nation offers its citizens ... For this reason, the National Council on Disability has declared that 'accessible transportation is a critical component of a national policy that promotes self-reliance and self-sufficiency of people with disabilities.'")

Section 12143 of the ADA provides:

It shall be considered discrimination for purposes of section 12132 of this title and section 794 of Title 29 [the Rehabilitation Act] for a public entity which operates a fixed route system ... to fail to provide ... paratransit and other special transportation services to individuals with disabilities, including individuals who use wheelchairs, that are sufficient to provide to such individuals a level of service (1) *which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system; or* (2) *in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system.*

42 U.S.C. § 12143(a) (emphasis added) (" § 12143" or "Section 12143"). In short, this provision requires that the *level* of paratransit service be comparable to fixed route service and that the *response time* be comparable to fixed route service only to the extent practicable. Congress charged the Secretary of the Department of Transportation ("DOT"or "the Department") with the duty of issuing final regulations to carry out Section 12143. *See* 42 U.S.C. § 12143(b).[21] Specifically, Congress mandated that the Secretary "shall establish *minimum service criteria* for determining the level of services required under this section." 42 U.S.C. § 12143(c)(3) (emphasis added).

Responding to the congressional order, DOT promulgated paratransit regulations, 49 C.F.R. Pt. 37, Subpt. F (ADA regulations); 49 C.F.R. § 27.19 (Section 504 regulations "shall comply with all applicable requirements" of the ADA) which are af-

---

at issue in this case. Therefore, that decision provides no real guidance here.

**21.** While the Department of Transportation was ordered to issue regulations regarding

Section 12143, the Attorney General was ordered to promulgate regulations regarding Title II generally. *See* 42 U.S.C. § 12134(a).

forded substantial deference by this Court.[22] *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations.... [T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (citations omitted); *Helen,* 46 F.3d at 331–32 (stating the same). The Secretary laid out the two basic paratransit requirements as "complementary service," referring to service that provides a "safety net" for the disabled, and "comparable service," referring to service that meets the service criteria. 49 C.F.R. pt. 37, App. D, § 37.121, p. 499 (1999). DOT explicitly rejected requests that it define comparability in a non-specific manner. *See* 56 Fed.Reg. 45584, 455600 (Sept. 6, 1991). The Department explained that, "[t]he view that there should be only a very general requirement for comparability, the content of which would be filled in at the local level, is inconsistent with the requirement for a set of minimum service criteria that would 'determine the level of services' to be provided." *Id.* In sum, the Secretary intended that local entities be bound by specific rules of service which would provide a safety net for *all* disabled individuals.

The Department issued the following service criteria relating to response time:

(b) Response Time. The entity shall schedule and provide paratransit service to *any* ADA paratransit eligible person at any requested time on a particular day in response to a request for service made the previous day.

. . . . .

(2) The entity may negotiate pickup times with the individual, but the entity shall not require an ADA paratransit eligible individual to schedule a trip to begin more than one hour before or after the individual's desired departure time.

49 C.F.R. 37.131(b) (emphasis added). In short, this provision requires, by the use of the term *shall,* that all ride requests must be granted for the next day, scheduled and provided within one hour of the desired departure time.[23] The Department described this provision as "a good balance of minimizing inconvenience to users and allowing providers sufficient time to schedule trips to maximize efficiency." *Id.* On its face, the regulations suggest an intent to accommodate *all* ADA-eligible callers with next-day service.

DOT promulgated the following service criteria concerning capacity restraints:

**22.** Septa seems to argue that Section 504 is not applicable to this case because ADA-eligible riders who are denied a trip request are not being issued a denial "solely by reason of his or her disability." 29 U.S.C. § 794. Rather, trip denials are issued because seats are unavailable. I disagree with this assessment of the law. While the text of Section 504 is accurately quoted, the ADA, by the text of both the statute and of the regulations, explicitly incorporates Section 504 into the ADA scheme. *See* 42 U.S.C. § 12143; 49 C.F.R. § 27.19. Thus, I conclude that the Rehabilitation Act applies to the case presented here.

**23.** The Secretary favored the next-day mandate over a 24–hour rule which some transit authorities preferred. *See* 56 Fed.Reg. 45584, 45606 (Sept. 6, 1991). The difference between next-day service and 24–hour service is illustrated as follows: Under a next-day requirement, a patron can call for a reservation anytime during the scheduled business hours and reserve service anytime during the next day's hours of service. *See* 49 C.F.R. pt. 37, App. D, § 37.131, p. 508 (1999). In contrast, under a 24–hour requirement, if the patron calls at 5:00 p.m., then the ride (or pick-up) would not need to be scheduled to begin at a time earlier than 5:00 p.m. the following day. *See id.*

(f) Capacity Constraints. The entity shall not limit the availability of complementary paratransit service to ADA paratransit eligible individuals by any of the following:

.    .    .    .    .

(3) *Any operational pattern or practice that significantly limits the availability of service to ADA paratransit eligible persons.*

(i) Such patterns or practices include, but are not limited to, the following:

(A) Substantial numbers of significantly untimely pickups for initial or return trips;

(B) *Substantial numbers of trip denials or missed trips;*

(C) Substantial numbers of trips with excessive trip lengths.

(ii) Operational problems attributable to *causes beyond the control* of the entity (including, but not limited to, weather or traffic conditions affecting all vehicular traffic that were not anticipated at the time a trip was scheduled) shall not be a basis for determining that such a pattern or practice exists.

49 C.F.R. 37.131(f) (emphasis added).[24] In short, this provision creates a pattern or practice violation where the public entity issues a substantial number, as opposed to a substantial percentage, of trip denials which cannot be attributed to forces outside the control of that entity.

A pattern or practice violation is defined as "regular, or repeated actions, not isolated, accidental, or singular incidents." 49

C.F.R. pt. 37, App. D, § 37.131, p. 509 (1999). Where such a pattern or practice is found, it is likely that the response time provision would be violated as well. *See id.* at 510. "Substantial number" is defined further by illustration. For example, if reservation lines open at 5:00 a.m. and patrons are regularly denied rides after 7:00 a.m., then the entity would be in violation. *See id.* at 509–10. Presumably, this extreme scenario would result in many more trip denials than in the present case. However, DOT noted that the list of examples was "not exhaustive" and that "other pattern or practices could trigger this provision." *See id.* at 510. Operational problems "beyond the control" of the entity refer to situations such as snowstorms, accidents, major traffic jams, or the like. *See id.* at 509. However, regular mechanical breakdowns or a consistent failure to maintain vehicles are not problems deemed outside the control of the entity. *See id.*

On its face, these definitions indicate that DOT expected agencies such as Septa to *attempt* to provide properly requested rides to *all* ADA-eligible riders, i.e., without exception. In fact, DOT explicitly rejected incorporating a 98 percent performance standard. *See* 56 Fed.Reg. 45584, 45608 (Sept. 6, 1991). This rejection suggests that DOT contemplated that providing rides 98 percent of the time failed to guarantee a "comparable" system. This inference finds additional support in an opinion letter written by the Federal Transit Administration's Chief Counsel, Patrick W. Reilly ("Reilly").[25] (*See* Ex. H of Pls.'

---

**24.** In addition to the service criteria for response time and capacity constraints, the regulations also list, though not at issue in this litigation, service criteria for comparative service with respect to service area, fares, trip purpose restrictions, and hours and days of service. *See* 49 C.F.R. § 37.131(a), (c), (d), and (e).

**25.** Such an informal interpretation (opinion letter), from the agency granted administrative authority from Congress, is given deference " 'as long as it is consistent with other agency pronouncements and furthers the purposes of the Act.' " *United States v. Occidental Chem. Corp.,* 200 F.3d 143 (3d Cir.1999) (quoting *Cleary v. Waldman,* 167 F.3d 801,

Mem.) In response to a letter from Cheryl Y. Spicer, Septa's Chief Operating Officer, asking whether the ADA regulations require a public entity to provide rides to "each and every eligible patron who requests one," (*Id.* at 1), Reilly wrote:

> those matters which the transit agency controls, such as decisions on resources for paratransit services, must be designed to meet the demand by *all* eligible riders, rather than some subset of total demand. . . . *[T]he term "substantial number" . . . cannot be read to allow a transit agency to make operational decisions to serve less than all eligible riders.* . . . Operators must monitor current ADA complementary paratransit usage, acquire additional service based on projected demand, and maintain the ability to respond to surges in demand.

(*Id.* at 2–3) (emphasis added). I interpret that letter to conclude, in short, that the "substantial number" language cannot be used as a green light to intentionally create a system that denies rides.

One final point which becomes apparent to this Court upon analyzing the history of the DOT regulations is the fact that comparing constraints within a fixed route system and a paratransit system proved quite challenging to DOT. The Department offered the following comments which highlight this difficulty:

> It is true, of course, that there are capacity constraints on fixed route transit. Certain potential routes are not served, runs are not made at certain times of day, and these limits restrict everyone's ability to travel on the fixed route system. Capacity constraints of this kind are already reflected in the requirements for paratransit, given the service area and hours and days criteria. It is also true that packed buses pass by passengers waiting at stops and that full trains pull out of stations leaving passengers standing on the platform. In each of these cases, however (which are most likely to occur at peak travel periods when headways are shortest), all the passengers have to do is wait a little longer for the next bus or train to come. *Certainly no system administrator tells such a passenger that he can forget about traveling that day because he has already ridden the bus 20 times that month or that he needs to work his way to the top of a waiting list before he can elbow his way onto a train. If the administrator of a paratransit system tells a similar story to a passenger, it is not a story about a comparable system. Capacity constraint mechanisms of this kind are incompatible with a comparable paratransit system, and the rule will continue to prohibit them.*

56 Fed.Reg. 45584, 45608 (Sept. 6, 1991) (emphasis added). In short, comparing these systems is like comparing apples and oranges because a constraint on a fixed route system never results in a patron being denied a ride altogether, absent an uncontrollable force. This incomparability was further emphasized in another opinion letter authored by Reilly, Federal Transit Administration's Chief Counsel. (*See* Ex. E of Pls' Mem. II.) In addressing whether a substantial number of denials on a fixed route system could justify the same number of denials on a paratransit system, Reilly noted that: " '[T]rip denials' on the fixed route system would be comparable only if the injury (the time the passenger must wait until her demand is met) is the same. As a practical matter, however, a trip denial on the ADA complimentary Paratransit system inflicts a much more serious injury than does a trip denial on

808 (3d Cir.1999), *cert. denied,* 528 U.S. 870, 120 S.Ct. 170, 145 L.Ed.2d 144 (1999)).

the fixed route system." (Ex. E of Pls' Mem. II at 2.) This admission of incomparability coupled with the more dramatic impact a paratransit constraint has on an ADA-eligible rider suggest to this Court that in determining whether a pattern or practice violation exists, the number of trip denials issued deserve heightened scrutiny.

Septa essentially attempts to seek refuge in the fact that 97.2 percent of the time it provides rides to ADA-eligible patrons. This argument misses the point of the statute. The focus is *not* on the *percentage of rides that Septa does provide* to the disabled, but rather, the *number of rides that Septa fails to provide* to these patrons and the *reasons for that failure.* (*See* Ex. H of Pls' Mem. at 2) (Reilly opinion letter determining that, "[i]n considering the relationship service capacity and trip denials, it is probably more useful to focus on the number and nature of trip denials rather than the percentage of demand met.' ") (quoting letter from Gordon Linton, former Administrator of the Federal Transit Administration). I understand and appreciate the demands placed on Septa. DOT was not blind to the difficult standard being imposed on public entities like Septa. The Department logically determined, however, that the five year phase-in period, the two-hour negotiated window, and the eligibility limits reduced the pressure to impose capacity constraints. *See* 56 Fed.Reg. 45584, 45608 (Sept. 6, 1991). In addition, the statute allows for a waiver where compliance with the service criteria creates an undue financial burden. *See* 42 U.S.C. § 12143(c)(4);

49 C.F.R. § 37.151. Septa has never applied for this waiver.

■ I conclude from the facts not in dispute that (1) Septa fails to provide rides to *any* ADA-eligible caller as mandated by the next-day mandate; and (2) on a regular and consistent basis, Septa denies rides to a substantial number of ADA-eligible patrons which constitutes a pattern and practice violation of the capacity constraint provision. In a 13–month period, nearly 30,000 ADA-eligible patrons were denied rides. Every day, approximately 74 disabled individuals are prevented from using the paratransit system. Spread over a 24 hour day, each hour, an average of 3 disabled individuals are denied rides. During the daytime hours, it is likely a higher number. Every day, around 30 such patrons are denied next-day service.[26] Every weekend day, approximately 75 such riders are denied rides. Every day, an average of 66 peak-hour riders are forced to find alternative transportation. These individuals are kept from not only personal engagements, but from jobs and medical appointments as well. For these disabled persons, Septa's present paratransit system offers no safety net.

I want to emphasize, however, that much more troubling than the actual number of capacity denials issued everyday is the fact that Septa has never even attempted to provide rides to 100 percent of the ADA-eligible callers. Septa's paratransit budget, despite contrary advice from the Federal Transit Administration, assumes that not all disabled riders will be granted rides. Septa has never studied what additional resources could be provid-

---

**26.** Septa contends that its next day record has improved because in nearly each month during May 1999 to May 2000, it provided an increasing number of reservations compared to the month before. (*See* Pls.' Ex. A3.) I find this argument unpersuasive since the same data also demonstrates that in nearly every month from September 1999 to May 2000, Septa issued an increasing number of capacity denials compared to the month before. (*See id.*)

ed or what different methods of operation could be to employed to meet 100 percent of the paratransit demand. For example, Septa seems to have never questioned whether changing its 7–day advance reservation system could lead to fewer capacity denials. In 1996, DOT amended the regulations to remove the former 14–day advance reservation requirement. *See* 61 Fed.Reg. 24409, 25412–13. The Department repealed this provision largely because so many commenters complained that advance reservations "caused an unmanageable number of cancellations and no-shows." *Id.* Apparently, many callers took advantage of the 14–day system because they worried that if they waited until the day before travel, they would be unable to secure a reservation. *See id.* This action seemed to have created excessive no-shows and cancellation. *See id.* Perhaps, if Septa rethought its current policy, more ADA-eligible riders would be served.

Septa also fails to use its entire fleet of vehicles to provide additional rides. Every day, approximately 7 to 37 vehicles sit unused for no explained reason. Every day, an average of 6 to 30 vehicles are unaccessible because of mechanical problems or preventative maintenance. Septa has not asked for additional vehicles in the last three years to help meet the demand.

Finally, Septa provides a greater percentage of its rides to SRP patrons, who are not ADA-eligible and therefore not protected by statute, than to ADA-eligible patrons. While this Court applauds Septa's commitment to the elderly community, Septa may not rely on that commitment to excuse itself from its duties under the ADA and the Rehabilitation Act. The record fails to show that Septa considered a system to give priority to a disabled rider over an SRP patron. In sum, I find that the above mentioned deficiencies are with-

in the control of Septa and are the primary reasons that Septa issues capacity denials.

Septa claims that "it can only make a best estimate about the demand for any given day." (Def.'s Mem. at 25.) This assessment of Septa's abilities does not comply with the law. Septa also contends that it "follows a prudent policy of keeping a reasonable number of vehicles out of service on the streets each day." (*Id.* at 26.) A policy that helps cause regular capacity denials cannot be deemed prudent by this Court. To the contrary, as noted by Reilly, the Federal Transit Authority's Chief Counsel, "[o]perators must monitor current ADA complimentary paratransit usage, acquire additional service based on projected demand, and maintain the ability to respond to surges in demand." (Ex. H of Pls.' Mem. at 3.) DOT further observed that "[t]o make a short-term reservation or real-time scheduling system work properly, transit providers need to make sure that adequate vehicle and communications capacity is available, such that systematic denials of service do not exist to an extent that would constitute a capacity constraint." 61 Fed.Reg. 25409, 25413 (citing 49 C.F.R. § 37.131(f)(3)(i)(B)). Succinctly put, I conclude that while Septa provides rides for *many* ADA-eligible patrons in compliance with the law, Septa may not rely on its own inadequacies to justify its noncompliance with the ADA and the Rehabilitation Act for *all* ADA-eligible patrons.

## II  CONCLUSION

Quite simply, the law demands more from Septa. I conclude that the stipulated facts and uncontested evidence demonstrate that Septa has violated the next-day mandate and the capacity constraint provision of the regulations under the ADA and the Rehabilitation Act. I rule today only on the issue of liability and conclude that

the record does not contain the necessary evidence or detailed arguments for this Court to impose the proper remedy upon Septa with any certainty that the relief to plaintiffs *will* be ultimately efficacious. An appropriate order and declaration follows.

### ORDER

**AND NOW,** this 4th day of January, 2001, upon consideration of the cross-motions of plaintiffs Liberty Resources, Inc. ("LRI") and Consumer Connection (Document No. 9) and defendant Southeastern Pennsylvania Transportation Authority ("Septa") (Document No. 10), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the claims of plaintiffs alleging that Septa has violated Title II of the Americans with Disabilities Act of 1990 ("ADA"), 104 Stat. 337, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 87 Stat. 394, 29 U.S.C. § 794, and the responses thereto, and for the reasons set forth in the foregoing memorandum, it is hereby **ORDERED** that:

1. The motion of plaintiffs LRI and Consumer Connection is **GRANTED** in part. It is hereby **DECLARED** that Septa violated the ADA and Section 504 by failing to provide next-day service to all ADA-eligible patrons and constraining paratransit service by operating in a pattern or practice that significantly limits the availability of rides to ADA-eligible patrons by issuing a substantial number of trip denials and operating a system that fails to attempt to provide rides to all disabled riders.

2. That part of the motion of plaintiffs LRI and Consumer Connection, which pertains to specific requests for further declaratory or injunctive relief, is **DEFERRED** as **BIFURCATED** pursuant to Federal Rule of Civil Procedure 42(b).

3. The motion of defendant Septa is **DENIED.**

4. Parties shall consult with each other and jointly report to the Court by February 22, 2001 as to the feasability of reaching an agreement as to the remaining issues of remedy and damages and whether negotiations by the parties, informal intervention by the Court or referral to an experienced transportation expert might assist in this resolution.